## ESSANAY FILM MFG. CO. v. LERCHE.

(Circuit Court of Appeals, Ninth Circuit. September 7, 1920. Rehearing Denied October 18, 1920.)

No. 3445.

1. **Evidence ☞378(5)—Telegram by manager stating offer by president, admissible, without proof of manager's authority.**

A telegram by the manager of a film corporation, stating that the president of the corporation had agreed to offer employment to plaintiff as an actress on terms therein stated, is admissible to establish the terms of the contract, without proof that the manager was authorized to employ actresses, where there was evidence to show that the president had authorized the offer as stated in the telegram.

2. **Corporations ☞432(12)—Evidence held to sustain finding that president authorized telegram by manager.**

In an action for breach of contract of employment of a motion picture actress, evidence of negotiations between the actress and the manager, resulting in a telegram from the manager, stating the president had agreed to certain terms, with testimony by the manager as to his conversations with the president, held to sustain a verdict finding that the president authorized the telegram, notwithstanding his denial.

3. **Corporations ☞521—Instruction submitting issues of manager's authority must be construed with evidence.**

In an action for breach of a contract employing a motion picture actress an instruction submitting to the jury the question whether the defendant's manager had authority to employ plaintiff must be treated as referring to his authority to send a telegram on behalf of the president, which was introduced in evidence, not as submitting the issue whether he had independent authority.

4. **Frauds, statute of ☞154—Jury finding held to preclude amendment of answer to plead statute.**

Where the jury found that the president of the defendant corporation authorized the sending of a telegram offering employment to plaintiff, which was sufficient to comply with the statute, it was not error for the court to refuse to defendant leave to amend its answer, so as to set up the statute.

5. **Master and servant ☞40(3)—Evidence held to show actress' objection to part assigned was justified.**

In a suit for breach of contract of employment of a motion picture actress, evidence held sufficient to support a verdict finding that plaintiff's objection to appearing in a part assigned was that it was unfitted to her experience, not, as defendant contended, because it was only a two-reel film.

6. **Master and servant ☞30(5)—Dramatic actress can refuse assignment to comedy.**

Where a film company employed an actress, who was skilled in the representation of dramatic emotional parts, with knowledge of the character of her work, the employment is presumed to have been for similar parts, so that she could properly object, and even refuse to appear in a comedy part, for which she was not fitted.

In Error to the District Court of the United States for the Southern Division of the Northern District of California; Oscar A. Trippet, Judge.

Action by Charlotte Burton Lerche against the Essanay Film Manufacturing Company. Judgment for plaintiff, and defendant brings error. Affirmed.

Alfred Wright and Alexander Macdonald, both of Los Angeles, Cal., for plaintiff in error.

W. J. Ford, Henry G. Bodkin, and Leon R. Yankwich, all of Los Angeles, Cal., for defendant in error.

Before GILBERT, ROSS, and MORROW, Circuit Judges. .

MORROW, Circuit Judge.  This is an action for damages for breach of contract of employment, brought by Charlotte Burton, a dramatic motion picture actress, against the Essanay Film Manufacturing Company, in which a jury rendered a verdict in favor of the defendant in error against the plaintiff in error in the sum of $8,200, upon which a judgment was duly entered.  At the inception of the trial, it appeared that the plaintiff had married since the institution of the action, and upon motion her name was changed, so as to appear as Charlotte Burton Lerche.  Throughout the entire proceedings, the plaintiff, who is the defendant in error here, was referred to as "Miss Burton," and she will be so referred to in this opinion.  The plaintiff in error will be referred to as the "company."

The complaint contained two causes of action.  In the first cause of action it is alleged that the company contracted to employ Miss Burton as a motion picture actress for the period of one year, beginning the 27th day of November, 1916, at a salary of $200 weekly during all of said year; that on the 30th of November, 1916, Miss Burton entered upon her employment under said contract, and thereupon fulfilled and performed her part of said contract according to its terms until about the 12th day of February, 1917, when the company willfully and without any lawful cause whatsoever refused to permit her to continue further in her employment under said contract and discharged her therefrom.  It is alleged that Miss Burton was, and at all times has been, and is, ready, able, and willing to perform all the terms, requirements, and conditions of said contract on her part to be performed.  It is alleged that by reason of the discharge of Miss Burton she has been damaged in the sum of $8,200.

In a second cause of action Miss Burton alleged that she was employed for the period of one year as a dramatic motion picture actress; that the company further contracted to give and furnish her a large amount of favorable publicity as such dramatic motion picture actress in the newspapers throughout the United States, and to present her in leading emotional dramatic rôles in all motion pictures produced by the company during the term of her employment requiring the services of an emotional dramatic motion picture actress.

The company in its answer denied the allegations of the complaint, and particularly denied that the company entered into a contract with Miss Burton for her services as a motion picture actress, or for any other services, for a period of one year, and averred in its first separate answer that the company agreed to employ Miss Burton for no definite period of time in the nature of what is generally known in the theatrical profession as a "try-out"; that is to say, an employment from week to week on trial, for the purpose of ascertaining whether or not Miss

Burton would be suitable to the company for parts that would be assigned to her by the company as a motion picture actress in the scenarios and plays selected by the company, and for such services the company would pay her the sum of $200 per week.

In an amended answer the company alleged that it had paid Miss Burton a salary of $200 per week for the first 10 weeks; that it had assigned her to a principal part in a photoplay, and requested her to accept and play the part, which she refused to do, and because of such refusal the company terminated the contract. The company also alleged that by agreement with Miss Burton the contract had been terminated and abandoned on January 29, 1917.

At the trial, upon the conclusion of the evidence on behalf of Miss Burton, the court dismissed the second cause of action, and the case proceeded to a conclusion upon the first cause of action, and a verdict was rendered thereon in favor of Miss Burton in the sum of $8,200. From the judgment entered upon this verdict the company brings the case here upon writ of error.

It appears from the record that the Essanay Film Manufacturing Company is a corporation organized and doing business under the laws of the state of Illinois, with a plant in the city of Chicago; George K. Spoor, at the time mentioned in the complaint, was president of the corporation, residing in Chicago; the employment of Miss Burton by the company at a salary of $200 per week was admitted by the company's separate and amended answer, and by the testimony of Mr. Spoor, the president of the company. Whether that employment was to continue for the period of one year, as claimed by Miss Burton, or from week to week only, as claimed by the company, was the first question raised by the complaint and separate answer.

The evidence supporting the verdict in favor of Miss Burton was a telegram, dated at Chicago November 15, 1916, addressed to Charlotte Burton, Santa Barbara, Cal., in which it is stated:

"Mr. Spoor has agreed on two hundred for first year and with option on second year at three hundred. Suggest you arrange to come at once. I will make contract agreeable to you on arrival. [Signed] V. R. Day."

[1] Counsel for the company objected to this telegram, on the ground that no authority had been shown for sending the telegram seeking to bind the defendant company without obtaining from Mr. Day any statement or any description of the duties of his employment, other than the bald statement that he was the business manager of the corporation, whether these duties involved at that time the employing of actors or actresses, either for one year or for two. The court overruled the objection, referring to some statement not in the record, made by the attorney for the plaintiff on opening the case to the jury, and for the further reason that "Miss Burton had gone on there in pursuance of this telegram, and gone to work and received the compensation for it." There was the further obvious answer to the objection that Mr. Day did not assume to employ "actors or actresses for one year or for two." What he stated in the telegram was that "Mr. Spoor has agreed on two hundred for first year and with option on

second ·year at three hundred." Was this statement true or false? This was the only question that could be raised on this telegram.

[2] Day testified that he was employed by the company in the capacity of business manager, and had held that position since 1910, and had been in the company's employ until June 1, 1919; that he first met Miss Burton in the latter part of 1916 in California, and discussed her employment with the company, but nothing final was said about her employment. The witness then went back to Chicago, and then had some correspondence with her in the form of letters and telegrams. The telegram mentioned above was part of this correspondence. Pursuant to this telegram, Miss Burton went to Chicago, and was paid her expenses to Chicago and $200 per week for a period of 9 weeks, when she was dismissed.

The deposition of George K. Spoor, the president of the company, was read in evidence. He testified that Day was general all-round man in the city office; that he was in California in October and November, 1916, as an employé of the company. The witness first met Miss Burton the latter part of November, 1916, at the plant in Chicago, when Day introduced the witness to her. He talked with her for a few minutes; nothing was discussed about her becoming an employé of the company. The witness never at any time or place talked to her, or she to him, about becoming an employé of the company. Mr. Spoor admitted that he talked with Mr. Day some time in the early part of November or latter part of October, 1916, about employing Miss Burton, which he says was for a temporary period at a salary of $200 per week; that he said to Day:

"We will pay her salary during the time she is here, and until we find out what she can do, and, if she wants to come for a trial, all well and good. You can let her come, and we will see how good she is, and let you know whether we want her or not."

This deposition was read to Mr. Day upon the trial, who testified that—

"Nothing was ever said in the conversation about a try-out. After explaining to him her present employment, and her present salary ¡and her ability, as I had seen it in pictures and as explained to me, the salary was agreed upon at $200 a week, and nothing was said about try-outs or by the week. The year was always mentioned."

If this testimony of Day was true, the employment of Miss Burton was by Mr. Spoor, the president of the company, and not by Day; the latter acting in the transaction merely as a clerk or an amanuensis of Spoor in reducing the agreement to writing in the form of the telegram to Miss Burton. Spoor does not deny that Day had authority to send the telegram and engage Miss Burton.

Here was a direct contradiction between the testimony of these two witnesses with respect to the term of the employment, a controlling fact in the case. The attending circumstances were in favor of Day's testimony. He did not assume to employ her while he was in California. He submitted the question of her employment and the terms to Mr. Spoor. The telegram was·sent immediately after the conversation respecting the employment and terms. Spoor said to Day, "You

can let her come," and the employment was waiting upon that telegram. Miss Burton accepted the terms and proceeded to Chicago, where she was paid her expenses and a salary of $200 a week for 9 weeks. The further fact that when Miss Burton called upon Mr. Spoor in Chicago, upon her reporting there for employment, "nothing was said about her becoming an employé of the company," tends to show that Mr. Spoor treated that feature of Miss Burton's relation to the company as a closed incident. The question was one of fact as to whether the telegram correctly stated Mr. Spoor's action in the matter, and was submitted to the jury for its finding. The finding was in favor of the plaintiff.

It is true that the testimony was permitted to take a wider range concerning the negotiations leading up to the final engagement of Miss Burton; but all of these matters were subordinate to the controlling question: Did Mr. Spoor authorize the employment, as set forth in the telegram to Miss Burton dated November 15, 1916? If he did, the contract was entered into as alleged in the complaint. The jury so found, and that disposes of that question, and also the objection that the court erred in admitting the telegram in evidence.

[3] It is true the court submitted to the jury the question whether Day had authority to employ Miss Burton; but this instruction must be treated in the light of the evidence as referring to the employment in accordance with the terms of the telegram, and not that Day assumed any independent authority in the transaction.

[4] The court did not err in refusing the application of counsel for the company to file an amendment to its answer setting up the statute of frauds. The ground upon which this application was made was that the contract proven was an oral contract entered into with Day. That question is disposed of by the evidence and the verdict of the jury that the contract entered into was evidenced by the telegram to Miss Burton, signed by Day, and authorized by Spoor, dated November 15, 1916. It is not questioned that the telegram, if authorized, was a sufficient writing under the statute of frauds. There was no material variance between the proof and the allegations of the complaint concerning the terms of the employment of Miss Burton. The ruling of the court on that question was also correct.

[5] Concerning Miss Burton's discharge from the employment of the company, it appears from the evidence that Miss Burton had reported for employment at the office of the company in the latter part of November, 1916; that she continued subject to call for about 9 or 10 weeks, when she was given a comedy play entitled "Black Cat Comedy" by the director. She protested that there must be some mistake, as she did not do comedy. She appealed to a Mr. Eubank, who it appears had cast her in this play. Obtaining no satisfaction from him, she appealed to Mr. Spoor, to whom she reported in substance that she had been cast in a "Black Cat Comedy"; that she did not do comedy, and could not hope to make good; that she was absolutely inexperienced in comedy, and that she was a dramatic actress. Mr. Spoor made inquiry concerning the assignment, and she said to him:

"Perhaps Mr. Eubank does not know my work. However, I said, I have told Mr. Day, and Mr. Van Dyke, and Mr. Young, who are directing here, that there are three pictures of mine down town showing in the theaters which will give them a very good idea of the nature of the acting I have been doing, and I told him I would be awfully glad if he would run off some of my stuff to see my work, and he said that he had enjoyed my still pictures; that is, still pictures are pictures taken of situations. I said, 'Oh, you saw my still pictures?' He opened a drawer in his desk, and took out about 200 pictures of situations I was in. He said, 'I have enjoyed them very much.' I said, 'You can readily see, Mr. Spoor, I am a dramatic actress, because of the situations of mine, the stills;' and he looked them over, and he was very lovely, and he said, 'Well, you had better calm yourself down now; go to your dressing room, to your hotel, and I will take this up.'"

The testimony of Mr. Spoor relating to this interview is as follows:

"The second and last time I saw Miss Burton, she came to me alone to my office at the Essanay plant, and told me that Mr. Eubank had cast her in a two-reel production, and that she would not appear in a two-reel production, because she had been engaged to appear as leading woman for Mr. Walthal in five-reel productions, or at least other five-reel productions. I told her that that could not be so, as I had no knowledge of that fact, and that I had other people on the pay roll drawing as much or more money than she was, people who were better known, and they were expected to appear in any productions, whether one, two, or five reels, that we would cast them in, and stated that I would expect her to appear in the two-reel production that Mr. Eubank had cast her for. I also told her that we did not know what her work was, and had no way of telling, unless she appeared in this production, and that we would have no way of telling, and I expected her to take the part. She said, 'I would rather not. I would rather wait for a five-reel production' I said, 'I expect you to take this part and show us what you can do.' She made no reply to this, but left the office."

A number of days after that interview Miss Burton received the following notice of dismissal:

"Chicago, January 29, 1917, Miss Charlotte Burton, Essanay Studio, Chicago, Illinois—Dear Miss Burton: We hereby give you notice that your services will not be required after two weeks from this date. Very truly yours, Essanay Film Manufacturing Company, George K. Spoor, President."

After receiving this notice, she tried to see Mr. Spoor about the dismissal and its cause, but was unable to secure an interview with him. Spoor testified that she left the employ of the company because she refused to accept the part Mr. Eubank had cast her for, and Eubank so notified him, and he gave her notice of dismissal. Mr. Eubank testified that she had refused to play the part he had assigned her in the "Black Cat Comedy." Miss Burton testified that she had not refused to play it, but had protested against playing it, because she did not do comedy. She had previously testified that she was absolutely inexperienced in comedy, and could not hope to make good.

[6] The court submitted to the jury the question whether Miss Burton had refused to perform her duties, referring to the testimony, and to the fact that notice of discharge did not specify why she was discharged and the further fact that she could not find out why she was discharged. The court also instructed the jury that —

"Where an actress is engaged to perform services, and where the contract is silent as to the nature and character of rôles to be played by such actress, you have a right to infer that she was to play in photoplays of the same

nature and character that she was capable of doing, and which the defendant knew she was capable of doing."

Miss Burton was a dramatic actress, and the evidence tends to show that her character representations in photoplays were known to Spoor. She was cast for a part in a comedy play; she had had no experience in comedy, and she believed she could not hope to make good. This was a reasonable objection on her part, whether considered as a protest or a refusal to play, and did not constitute a breach of contract on her part.

In Labatt on Master and Servant, vol. 1, p. 879, the author, in discussing what constitutes a breach of duty on the part of the servant, says:

"Nor has the master any right to require that the servant shall either temporarily or continuously engage in work which is distinctly and manifestly quite outside the circle of the duties incident to his position. The question whether in any given instance the work is of this description is one of fact. The material elements to be considered in determining this question are the general nature of the employment to which the contract relates, or capabilities which the servant was known to possess when he was engaged."

We are of the opinion that there was no error in submitting this question whether Miss Burton had been guilty of a breach of contract to the jury as a question of fact, to be determined in the light of all the surrounding circumstances. We find no prejudicial errors in the admission of evidence over the objection of counsel for the company or the instructions to the jury.

The judgment of the District Court is accordingly affirmed.