[L. A. No. 6890. In Bank.—March 20, 1923.]

THE HELLMAN COMMERCIAL TRUST AND SAVINGS BANK (a Corporation), Respondent, v. SOUTHERN PACIFIC COMPANY (a Corporation) et al., Appellants.

[L. A. No. 6891. In Bank.—March 20, 1923.]

THOMAS H. STOREY, Respondent, v. SOUTHERN PACIFIC COMPANY (a Corporation) et al., Appellants.

[L. A. No. 6892. In Bank.—March 20, 1923.]

ISAAC C. IJAMS et al., Respondents, v. SOUTHERN PACIFIC COMPANY (a Corporation) et al., Appellants.

[1] JURY TRIALS — INSTRUCTIONS — RULE OF CONSTRUCTION. — In determining whether the instructions of the trial court to a jury state correctly the law applicable to the particular case, the facts of the case as presented in the evidence to the jury must be borne in mind, and the assailed instruction must be considered in the light of the evidence in the case.

[2] WATERS AND WATERCOURSES—DIVERSION OF FLOOD WATERS—ACTION FOR DAMAGES AND INJUNCTION—NATURAL WATERCOURSE—INSTRUCTIONS.—In this action for damage to land by reason of diversion of flood waters and for injunctive relief, it is held that the trial court's instructions were full and exhaustive and free from error on the question as to what constitutes a natural watercourse.

[3] ID.—DIVERSION FROM NATURAL COURSE—INJURY TO LANDS.—No one has the right to divert either the usual or the torrential, or even the exceptional and unprecedented flow of waters from their natural and accustomed channels to another of the courses or channels of a river, if such diversion would result in precipitating upon the lands of another an outflow of said stream, which, but for such diversion, would in the main have pursued its way down its natural and accustomed channel, at a distance from, and without injury to such lands.

[4] ID. — INSTRUCTIONS — CHANGED CHANNEL — NATURAL CHANNEL — TIME.—In an action for damages for diversion of flood waters from one of the alleged natural channels of a stream to another channel thereof with the resultant overflow of plaintiff's land, and also for injunctive relief against diversion, the trial court properly refused to instruct the jury to the effect that the changed channel of a stream could not take on the character of a natural

channel thereof without an uninterrupted flow of the waters of the stream therein for the period of five years, or, in other words, for the full period of prescription.

[5] ID.—RIGHT OF DIVERSION—CHARACTER OF CHANNEL—FLOODS.—In such a case, the trial court properly instructed the jury in effect that the question of an extraordinary flood, or an unprecedented flood, or the act of God, as it is variously termed in law, had nothing whatever to do with the question of the liability or non-liability of the defendants by reason of the erection and maintenance of an obstructing dike, for, if the wash was a natural watercourse, defendants had no right to divert the waters therefrom, and if it was not, they had the right, in either case regardless of the character of the floods.

[6] ID.—LIABILITY OF DEFENDANT—TRANSFER OF OWNERSHIP OF LAND—AGREEMENT FOR CONSTRUCTION OF DAMS—INSTRUCTIONS.—The court properly instructed the jury in such case that the non-ownership by one of the defendants of the land upon which the dikes, dams, and embankments complained of were constructed, at the time when the flood which caused the damage occurred, did not absolve the particular defendant from liability for such damage, where said defendant had made an agreement with its codefendant that said dams, dikes, and embankments should be constructed by the latter, and that the former would pay a certain percentage of the cost of their construction and maintenance.

APPEAL from a judgment of the Superior Court of Los Angeles County. Louis W. Myers, Judge. Affirmed.

The facts are stated in the opinion of the court.

Henry T. Gage, W. I. Gilbert and Anderson & Anderson for Appellants.

George H. Moore, C. Elliott Miller and Tobias R. Archer for Respondent.

LENNON, J.—A rehearing of the three above-entitled causes after decision by this court, sitting in Bank, in one of said causes (L. A. No. 6890), was granted primarily because, in the petitions for rehearing, it was insisted that the opinion, delivered in the first instance by Mr. Justice Richards, of the first district court of appeal, sitting in this court *pro tem.*, failed to definitely deal with and directly dispose of appellants' contention that certain instructions were erroneous and grievously prejudicial in this that they permitted the jury to find that a new natural water-

course might in certain circumstances be created *"ipso facto, eo instanti,"*—that is to say that such a watercourse might be created overnight.

This contention seemed at first blush to be possessed of much merit and it was so plausibly and earnestly presented that we were constrained out of abundance of caution to grant the rehearing prayed for. However, a further and more minute consideration of the case, had immediately following the close of intensive and illuminating oral reargument, *pro* and *con,* of the phase of the case immediately in discussion, satisfies us that the opinion rendered in the first instance by Mr. Justice Richards, which is herein and hereby adopted as the opinion of the court, adequately deals with, definitely determines, and correctly decides every contention made by the appellants.

The opinion of Mr. Justice Richards is as follows:

"This action was instituted for the recovery of damages for the alleged diversion of flood waters from one of the alleged natural channels of a certain stream known as the Tejunga River to another channel thereof with the resultant overflow of the plaintiff's land, and also for injunctive relief against such diversion. The Tejunga River takes its rise in two branches known as the Big and Little Tejunga in the mountains lying to the eastward of the San Fernando Valley in the County of Los Angeles; these have their confluence near the mouths of their respective canyons, and thereafter the Tejunga River flows out across the San Fernando Valley and into the Los Angeles River; in so doing there has been created in previous years three separate washes or channels, through one or all of which the waters of the Tejunga River were accustomed to flow in times of high water on their way across the valley. The line of the Southern Pacific Railroad into that region was surveyed in about the year 1873, and work upon the construction thereof commenced, which resulted in its completion and in the inception of its operation in about the year 1876. In its general southerly course it crossed the Tejunga River, for which it made provision by means of trestle bridges of various lengths, depending upon the width of these several washes or channels at the point of its passage; these have been changed, rebuilt or improved from time to time, and have been supplemented by dikes and dams and embankments having for their purpose the protection of

the railroad line and trestles from the storm flow of the Tejunga River.

"The complaint herein alleges that for many years prior to January, 1914, and at all times since, there were three natural channels or watercourses of the said Tejunga River at or near and also below the point of passage of the railroad, and which are designated in said complaint as Wash #1, Wash #2, Wash #3, and which carry off the rain and storm waters of said stream; that of these Wash #1 carried off the major portion of said rain and storm waters, conveying them to the southward of plaintiff's lands and premises, while said Wash #2 carried off a minor portion of the rain and storm waters of said stream, conveying them to the northwest of plaintiff's lands and premises and those of its assignors; that during the year 1912 defendants constructed and caused to be erected certain dikes and embankments of earth, rock and cement across the mouth of said Wash #1, which were intended to divert the rain and storm waters of said stream which had been wont to flow down said Wash #1 into Wash #2, and which had the effect of such diversion during the winter season of 1914, when the rain and storm waters of said stream, which would otherwise have mainly flowed down the channel of Wash #1 and would have thus passed a mile or more to the eastward of plaintiff's said lands, and without any damage thereto, were forced to and did flow down and along Wash #2 and were precipitated upon the westerly portion of plaintiff's said lands, depositing large quantities of boulders, sand, gravel and other detritus thereon and washing away a considerable portion thereof, thus destroying and rendering unfit for cultivation or sale the portions of plaintiff's lands thus invaded to their great damage; wherefore the plaintiff prayed for injunctive relief preventing the defendants from maintaining or reconstructing the dikes and other obstructions across said Wash #1. The plaintiff also prayed for a mandatory order requiring the defendants to rebuild and repair dikes #2 and #3 so as to effectually prevent the rain and storm waters of said stream from entering the channel cut by it into Wash #2 to and crossing plaintiff's land. The plaintiff also prayed for damages in a large sum for injury to the several tracts of land damaged by the said diversion, and for general relief.

"The defendants in their answer denied most of the material allegations of plaintiff's complaint; they particularly denied, for want of information and belief, the averments of plaintiff's complaint that the Wash or channel designated therein as Wash #1 ever was a natural watercourse of said stream, or that it ever collected or carried off large quantities of the rain and storm waters thereof, or that prior to the erection of the defendants' dams and dikes, described in said complaint, said Wash #1 carried off the major portion of the rain and storm waters thereof, or that said Wash #2 carried off a minor portion of said rain and storm waters. They deny that whatever dams and dikes they had caused to be constructed along or across said stream were erected for the purpose of diverting said waters down or along said Wash #2, or that thereby said waters were forced to flow down Wash #2 as they would not otherwise have done; they denied that said waters were caused thus to flow through any faulty or negligent construction of said defendants' dikes, dams or embankments, or that any damage was caused to said plaintiff thereby. They allege affirmatively that the rainfall in 1914, with its consequent torrential outflow of said stream was unprecedented and was an act of God for which the defendant was not to be held liable. Wherefore the defendants prayed that the plaintiff take nothing by its said action. The cause proceeded to trial upon the issues as thus framed, before a jury. No special issues were framed or submitted to the jury, but upon submission thereof the court expressly confined their deliberations to the sole issue of damages. The jury returned a verdict in the plaintiff's favor fixing the damages at the sum of $10,000. Upon the return of this verdict the trial court ordered that judgment be not entered thereon at the time, but thereafter took additional evidence as to the right of the plaintiff to injunctive relief, after which it filed its findings of fact and conclusions of law adopting the verdict of the jury, but also making full and detailed findings upon all of the issues and facts involved in the case, and thereupon rendered its judgment awarding the plaintiff damages in the sum of $10,000 as found by the jury, and further granting plaintiff injunctive and mandatory relief substantially as prayed for in

its complaint. It is from such judgment that this appeal has been taken.

"The several contentions which the appellants urged upon this appeal relate to the instructions given or refused by the trial court to the jury. The first of these contentions is that the court erred in its instructions to the jury as to what constituted a natural watercourse. The body of the court's instructions in this regard had several references to the east wash or Wash #1, the main issue before the jury being as to whether that particular wash, prior to the construction of the defendants' dikes, dams and embankments, had during the past history of the outflow of the Tejunga River become such a natural watercourse thereof that the defendants could not lawfully obstruct or divert the flow of the waters of said stream therein to the plaintiff's damage. [1] In determining whether the instructions of the trial court state correctly the law applicable to a particular case, the facts of the case as presented in the evidence to the jury must be borne in mind, and the assailed instruction must be borne in mind, and the assailed instruction must be considered in the light of the evidence in the case. (*Essanay Film Co.* v. *Lerche,* 267 Fed. 353; *Hale Bros.* v. *Milliken,* 5 Cal. App. 344 [90 Pac. 365].) [2] In the case before us the instructions of the trial court were very full and exhaustive, particularly in their bearing upon the question as to what would constitute a natural watercourse. The appellants, in criticising these instructions, have selected certain excerpts therefrom which, taken alone and apart from the general body of the court's instructions, would seem to be subject to the criticism which the appellants aim at them. That criticism is that the court has thereby instructed the jury that a natural watercourse may be created and may exist merely through the fact that a stream through the action of its storm waters has cut a new channel through which its waters, if unprevented, would either continually or intermittently flow. This of course is not the law, and if the whole body of the court's instructions, when taken together, were found to be subject to this interpretation, they would undoubtedly be so prejudicially erroneous as to compel a reversal of this case. It is inconvenient to reproduce the entire body of the court's instructions for the purpose of showing that the appellants'

foregoing criticism is unsound, but a few excerpts therefrom may serve to show that it is so. The court begins its instructions upon this subject with the following words: 'To constitute a natural watercourse, there must be a stream usually or periodically flowing in a particular direction. It must flow in a definite channel having a bed, sides, or banks, and usually discharges itself into some other stream or body of water.' Again the court says: 'If a stream has a permanent or at least a periodical source of supply, and runs in a definite channel along a considerable distance, it may then break up into numerous small channels, or percolate into the soil, and sink away and still be, in legal contemplation, a natural watercourse for the distance that it flows from its source of supply to the point where it breaks up or percolates away or sinks away.

" 'If the conformation of the country is such that water flows in large quantities after heavy rains or when the snow melts, at regular seasons, through a well-defined channel which the force of the water has made for itself, and which is the accustomed channel through which it flows periodically, or would so flow when not interfered with by artificial dikes or dams, such channel is to be considered as a natural watercourse.

" 'In determining whether any channel or stream is a natural watercourse, its size is not a controlling element, either in respect to the volume of water carried or the length of its course, and, while the element of permanence is necessary, great age is not an essential attribute of a watercourse. If a channel has defined banks, with such characteristics as cause the water to flow in a definite direction or course, and has a stream bed which manifests the continued action of flowing waters, such channel may be a natural watercourse, even though of comparatively recent formation; and even though formed by an older stream changing its course in whole or in part, provided such change of course occurs from natural, as distinguished from artificial, causes, and is of a permanent character.' The court further instructed the jury that 'if you find that the wash named on the trial of this action as the East Wash of the Tejunga, or Channel and Wash No. 1, did at the time of the making of the dams and dikes by the defendants in 1911 and 1912, mentioned in the complaint of

the plaintiff, exist, and now exists, in its natural course, marked or defined, on the ground by definite bed, channel or wash, from the confluence or union of the Little and Big Tejunga across San Fernando Valley, east of Lankershim and down to the Los Angeles River, and that without human interference, dams or dikes, some part of the waters of said Little or Big Tejunga naturally and recurrently have flowed into, along and down said East Wash, and thereby reached the Los Angeles River, then the East Wash constitutes a natural watercourse. The foregoing instructions, when considered in the light of the evidence in the case, could not be otherwise understood by the jury than as having particular reference to the East Wash or Wash #1 of the Tejunga River. This wash, according to the great weight of the evidence in the case, was not a wash or channel of this river which had been created overnight or within even a short period of time prior to the defendants' construction of the dams, dikes and embankments which diverted the waters of said stream from pursuing their regular course along said wash during periods of torrential flow. There was some evidence in the case that Wash #1 had existed as one of the channels of this stream in times of high water as early as the year 1858, long before the railroad entered that region. There was much evidence from old residents of the region, and apparently of an unimpeachable character, that large quantities of water had flowed down this wash during the winter seasons of 1876, 1884, 1887, 1889 and every year thereafter during high water up to the year 1901 when the defendants began the construction of their works for the prevention of such flow, and the diversion of such waters to the other existing channel of such stream known as Wash #2. There is some evidence that the defendants made sporadic efforts during these later years to prevent the flow of storm waters down channel or Wash #1, but that these efforts were unsuccessful. If it was such a watercourse as is shown by the great weight of evidence in this case, it would be quite immaterial that the defendants had at various times prior to their activities in 1911 and 1912 made unsuccessful attempts at the obstruction of said watercourse and the diversion of such water; such efforts could only have significance in their application to newly created washes or channels, against which the owners of

lands thus freshly invaded would have the right to protect themselves by dams, dikes, embankments, levees and other obstructions having for their object the return of the stream to its former and natural channel. This, however, is not such a case, and it is impossible to conceive, in the light of the evidence freshly in the minds of the jury, that they could have misinterpreted the foregoing instructions of the court as having reference to any other sort of watercourse than one which had become, through many years of recurring flow, a definite and permanent channel for the outflow of the torrential waters of the Tejunga River.

[3] "The next contention of the appellants is that the trial court erred in its instruction to the jury as to the rights of the defendant to dike off the torrential waters of said river from said East Wash or Wash #1 thereof. This, however, is but a repetition in another form of its former objection, since if the East Wash had become a permanent and established watercourse of said river, it would follow as a matter of logical consequence that neither the defendants nor anyone else would have the right to divert either the usual or the torrential, or even the exceptional and unprecedented flow of these waters from their natural and accustomed channels to another of the courses or channels of said river, if such diversion would result in precipitating upon the lands of the plaintiff an outflow of said stream which, but for such diversion, would in the main have pursued its way down the East Wash or channel thereof at a distance from, and without injury to, plaintiff's land. The cases of *Horton* v. *Goodenough*, 184 Cal. 451 [194 Pac. 34], and *Weinberg Co.* v. *Bixby*, 185 Cal. 87 [196 Pac. 25], decided since the trial of this cause, contain nothing in their statement of the law respecting watercourses which is at variance with the instructions of the trial court in this case, when viewed in the light of the evidence before it. In each of these cases the main question was that of the right of a lower owner to protect himself against the flood waters of a stream which had newly escaped from its former or natural channel, even though in the exercise of his right so to do his reasonable effort in that direction might have the effect of causing damage to be inflicted upon the owners of other land.

[4]   "The appellants' next contention is that the trial court erred in refusing to give to the jury the following instruction: 'If you should find from the evidence that the so-called east or rock-crusher wash was formed by the rain storm or flood of 1889, or any other storm within the memory of man, and that such rain storm or flood so forming the same was an unprecedented flood, or act of God, as defined by these instructions, then you are further instructed that any channel so cut by such storm would not be or become a natural channel as defined by these instructions, unless permitted to remain without obstruction to its flow for the full period of prescription, to wit, five uninterrupted years. No authority is cited by the appellants to justify this instruction to the effect that the changed channel of a stream could not take on the character of a natural channel thereof without an uninterrupted flow of the waters of the stream therein for the period of five years, or, in other words, for the full period of prescription. Clearly, such is not the law. On the other hand, the instruction which the trial court gave upon this subject, and which is above quoted, embodies, I think, a correct statement of the law upon the subject. In addition thereto the trial court further safeguarded this subject in the minds of the jury by the following instruction: 'Every riparian owner has the right to protect his land from encroachment by overflow or change in the natural channel of any stream or wash flowing through his said land, and when any such encroachments have occurred, and the current of any such stream or wash has turned over upon his land, he has the right to restore it to its original channel and to do such matters and things as are necessary to retain its flow in its original channel; provided, however, that if it has formed a new natural watercourse, as defined in these instructions, then he has, thereafter, no right to restore it to its original channel, to the detriment of another.' These instructions are, as we have heretofore stated, to be read in the light of the evidence in the case, which, practically without contradiction, shows that this wash or channel number 1 was not of recent origin and was not caused by any single or extraordinary or unprecedented flood, but that the same had existed in practically the same condition in which it was in the year 1911, when the defendants began the construction

of their obstructing dikes and dams, for many years before that time. **[5]** The trial court was therefore correct in its instruction to the jury that 'The question of an extraordinary flood, or an unprecedented flood, or the act of God, as it is variously termed in law, has nothing whatever to do with the question of the liability or nonliability of the defendants by reason of the erection and maintenance of the dike which has been referred to as L–1, in this case.

" 'With respect to the erection and maintenance of the dike L–1 (the obstructing dike), if the so-called east wash or wash No. 1 was a natural watercourse, at the time of the erection of said dike in 1911 and 1912, then the defendants had no right to dam off the same or divert the waters therefrom, regardless of whether the flood of 1914 was an ordinary flood or an extraordinary flood. On the other hand, if said east wash, so called, or wash No. 1, was not a natural watercourse at that time, then said defendants did have a right to erect a dam across the same for the protection of their lands, equally regardless of whether the storm or flood of February, 1914, was ordinary or extraordinary.' These instructions in our opinion fully cover the propositions put forth by the defendants in the body of their requested instructions, which the court refused to give.

**[6]** "The appellants make the final contention that the trial court was in error in instructing the jury that the non-ownership by the defendant Los Angeles Land & Water Company of the land upon which the dikes, dams and embankments complained of were constructed, at the time when the flood which caused the damage occurred, did not absolve that particular defendant from liability for such damage. There is no merit in this contention since the undisputed evidence shows that said defendant had made an agreement with its codefendant, the Southern Pacific Company, that said dams, dikes and embankments should be constructed by the latter, and that the former would pay fifteen per cent of the cost of their construction and maintenance. This being so, if the construction of said barriers to the flow of the waters of the Tejunga River in one of its natural and accustomed watercourses was an actionable wrong, the said defendant Los Angeles Land & Water Company could not relieve itself from liability therefor in damages by a subsequent transfer of its title, even though

such transfer occurred prior to the time when the actual damage caused by the creation of such unlawful obstruction arose.  The trial court so correctly charged the jury.''

For the reasons stated in the foregoing opinion the judgment in each case is affirmed.

Waste, J., Kerrigan, J., Seawell, J., Wilbur, C. J., and Lawlor, J., concurred.

Justice Myers, deeming himself disqualified, did not participate in the foregoing.