[Civ. No. 16962. Second Dist., Div. One. June 5, 1951.]

ROBERT WECK et al., Respondents, v. LOS ANGELES COUNTY FLOOD CONTROL DISTRICT et al., Defendants; SOUTHERN PACIFIC COMPANY (a Corporation) et al., Appellants.

[Civ. No. 16963. Second Dist., Div. One. June 5, 1951.]

W. R. KRATKA et al., Respondents, v. LOS ANGELES COUNTY FLOOD CONTROL DISTRICT et al., Defendants; SOUTHERN PACIFIC COMPANY (a Corporation) et al., Appellants.

[Civ. No. 16964. Second Dist., Div. One. June 5, 1951.]

DOMENICO TONSO et al., Respondents, v. LOS ANGELES COUNTY FLOOD CONTROL DISTRICT et al., Defendants; SOUTHERN PACIFIC COMPANY (a Corporation) et al., Appellants.

[Civ. No. 16965. Second Dist., Div. One. June 5, 1951.]

GEORGE M. JAMES et al., Respondents, v. LOS ANGELES COUNTY FLOOD CONTROL DISTRICT et al., Defendants; SOUTHERN PACIFIC COMPANY (a Corporation) et al., Appellants.

[Civ. No. 16966. Second Dist., Div. One. June 5, 1951.]

CLOTILDIS KERNS et al., Respondents, v. LOS ANGELES COUNTY FLOOD CONTROL DISTRICT et al., Defendants; SOUTHERN PACIFIC COMPANY (a Corporation) et al., Appellants.

[Civ. No. 16967. Second Dist., Div. One. June 5, 1951.]

BRUCE H. KRATKA, Respondent, v. LOS ANGELES COUNTY FLOOD CONTROL DISTRICT et al., Defendants; SOUTHERN PACIFIC COMPANY (a Corporation) et al., Appellants.

[Civ. No. 16968. Second Dist., Div. One. June 5, 1951.]

RICHARD B. REINERT, Respondent, v. LOS ANGELES COUNTY FLOOD CONTROL DISTRICT et al., Defendants; SOUTHERN PACIFIC COMPANY (a Corporation) et al., Appellants.

[Civ. No. 16969. Second Dist., Div. One. June 5, 1951.]

JEAN CHURCH JAHNS, Respondent, v. LOS ANGELES COUNTY FLOOD CONTROL DISTRICT et al., Defendants; SOUTHERN PACIFIC COMPANY (a Corporation) et al., Appellants.

[Civ. No. 16970. Second Dist., Div. One. June 5, 1951.]

CARL RICHARD H. MULLER, Respondent, v. LOS ANGELES COUNTY FLOOD CONTROL DISTRICT et al., Defendants; SOUTHERN PACIFIC COMPANY (a Corporation) et al., Appellants.

C. W. Cornell and Randolph Karr for Appellants.

Stewart, Shaw & Murphey and William L. Murphey for Respondents.

HANSON, J. pro tem.—This is the second appeal, in nine separate actions (consolidated for trial) commenced by the respective respondents, to recover damages that resulted to them on March 3 and 4, 1943, as a consequence of the flooding of their lands by storm or flood waters which broke out of a drainage ditch known as Eaton's Canyon Wash.

The respondents, as plaintiffs below, named as defendants the Southern Pacific Railroad Company (hereinafter called "Railroad Company"), the Southern Pacific Company (hereinafter called "the Company"), the Los Angeles County Flood Control District (hereinafter referred to as the "District") and certain of its employees and officers. It is enough at this point to say that liability against all of these defendants was based on negligence.

The map which we set forth herein (based on exhibits in

the case) will help to point out some of the salient facts. The lands of respondents lie in a triangular area east of Encinita Avenue and north of the Southern Pacific Railroad tracks. The drainage ditch known as Eaton's Canyon Wash for a period of time prior to 1906 ran from A to B to C passing under the right of way of the Southern Pacific through a trestle which was constructed over the wash in such a manner as not to interfere with storm or other waters passing down the channel of the wash or drainage ditch. By 1906 or 1907 the channel became blocked at the locality of the trestle and thereupon waters therein flowed easterly along the north side of the railroad right of way from the bend thereof at "B" to "D" on the map and not at all from "B'" to "C." At the time of the storm in question, the storm waters originating in the Sierra Madre Mountains flowed southeasterly, in the drainage ditch known as Eaton's Wash toward Encinita Avenue but broke out of the banks of the wash at point "A" and flooded the area depicted by dots on the map.

We proceed to state additional facts which are germane to a decision of the case. When in 1873 the predecessor railroad of the Southern Pacific Company constructed its railroad line running from Los Angeles easterly it ran roughly parallel to the Sierra Madre Mountains which lay to the north of the railroad. In that day, it seems, the surface and storm waters originating in those mountains were largely absorbed by the ranch lands north of the railroad in the locality of what is now known as Savanna, California. However, it appears that, even at that time, excess storm waters coming out of a canyon in the mountains known today as Eaton's Canyon naturally flowed down a course known today as Eaton's Wash to a point westerly of Savanna but east of a highway known as Lower Azusa road at the point where the road diagonally crossed the railroad tracks. Initially, the excess storm waters reached the railroad right of way 531 feet east of the point where the railroad and highway intersected. Accordingly, the railroad constructed a culvert through its roadbed at the point where the waters flowed so as to permit them to flow southeastwards following the low point of the land's topography. Later on, the storm waters shifted their course somewhat westerly so as to reach the right of way only 35 feet east of the point where the road and railway intersected. To meet this new situation the railroad constructed a trestle in its roadbed to permit the water to flow unimpeded in this new natural channel. This channel coming from the north

and running slightly southeasterly is depicted on the map as having followed the line A, B, C. At times during torrential rainfalls the channel made by nature was insufficient in depth and width to wholly confine the flood waters therein and hence in part flowed easterly along the northerly side of the railroad. To the south of the railroad the natural channel ran through the approximate center of the Adams ranch and then onwards into the Rio Hondo River.

There is evidence that in 1906 the owners of the Adams ranch erected on their own land, but immediately adjacent and parallel to the railroad right of way on the north, a tight board fence directly across the natural drainage ditch and that this fence extended easterly and westerly of the ditch a total distance of about 1,200 feet, in other words, the whole length of the Adams property. There is likewise evidence that this construction acted as a dam to storm or flood waters and as a consequence that the drainage ditch became filled up with boulders and sand not only on the south side of the right of way, but underneath the trestle, and on and across the north side of the right of way. Moreover, there is evidence that as a result of this damming-up process the storm waters coming down from the north were deflected (at point B on the map) and flowed easterly along the north side of the railroad right of way. There was no evidence that water could get through what had been the trestle opening after it had filled up with boulders and sand. After that condition had arisen the railroad pulled up its trestle and dumped dirt in the holes which had been occupied by its timbers.

The railroad did not at any time remove the boulders and sand which clogged the natural ditch at the point where it crossed its right of way. It did, however, shore up its northerly right of way on either side of, but not across, the natural drainage ditch. However, after the natural drainage ditch was fully blocked, in the manner stated, the railroad shored up the natural channel of the ditch where it had crossed its right of way. Additionally, thereafter the railroad widened and extended the new ditch which ran along on the north side of its right of way. Furthermore, at various times the railroad removed boulders and sand from the new ditch (B to D), as well as from the old portion of the ditch as far north as point A is depicted on the map. This was done to permit the storm waters to flow more freely and as a protection to the roadbed.

Six of the plaintiffs, i.e., James, Mueller, Reinert, Weck,

Tonso, and W. R. Kratka, acquired title to their lands from one Platt under deeds, in which was inserted the phrase, "Subject to an unrecorded agreement . . . between Platt and Southern Pacific Railway Company." All of these named plaintiffs acquired their lands which are here involved, subsequent to the time the old channel B to C was blocked up.

The agreement recited that the railroad company was to do certain excavating in the new ditch and, in part, on Platt's land; that such work would be for the benefit of Platt's land and the roadbed of the railroad as a protection against storm waters; that Platt should have the right at any time to clean out the new ditch, whether it ran on the right of way or on his own land. As the only portion of Platt's land which was excavated was that acquired by Mr. James and Mr. Mueller the contract was admitted in evidence only in their cases against the railroads.

Beginning with the year 1915, and prior to 1940, the Los Angeles County Flood Control District had acquired title to the right of way of the old flood channel (A to B) and of the new continuation thereof (B to D). In addition the Flood Control had acquired from the plaintiff Kerns a strip of land 25 feet in width running the full distance of his property east and west, i.e., 1674.11 feet. This strip of land immediately adjoined the new channel on its northerly side. Upon this strip for its full length the Flood Control District built a dike 15 feet in height. Likewise the Flood Control District acquired a permit to spread dirt and boulders upon a strip of land immediately adjacent to the south of the new channel which extended all the way from B to D.

Prior to 1906 the original natural ditch from A to B was only about 30 feet in width and about 4 feet in depth north of the railroad and of smaller dimensions south of the railroad. Prior to that year the railroad had excavated a small ditch along its northerly right of way, beginning at the original natural ditch (B), which ran easterly to D. After 1907 the railroad gradually widened and deepened this ditch evidently to meet the silting up process going on in the old ditch and the new, as well. By 1936 the railroad had widened and deepened the new ditch considerably One witness for the plaintiffs stated it was widened to three times its original width. In the meantime it had several times cleaned it out. About 1936 the district undertook to clean out the ditch and to build up the banks along the course of the old and new ditch lying to the north of the railroad. For a period of some

three or four years prior to the March, 1943, flood, the district had done little or nothing in the way of cleaning out the ditch.

At the first trial the trial judge at the conclusion of all the evidence directed a verdict in favor of all the defendants. On the appeal therefrom another division of this court affirmed the judgment entered upon the ruling except as to the two named defendant railroads. (*Weck* v. *Los Angeles County Flood Control Dist.*, 80 Cal.App.2d 182 [181 P.2d 935].)

Upon that appeal the railroads rested their case for an affirmance on three major grounds. *First,* that there was no evidence that Eaton's Canyon Wash was a watercourse from B to C or for that matter from A to C. *Second,* that there was no evidence that the railroad companies diverted the flow of the waters of the wash. *Third,* that there was no evidence of any act by the railroads which proximately caused the waters to leave the channel at A, which it is conceded directly caused the damages. The court ruled that there was substantial conflicting evidence on all of these points and, hence, that the jury should have been permitted to rule on the conflict.

While the railroads on the first appeal contended that the channel B to D should be classed as though it was a part of the natural watercourse or natural drainage ditch (A to B) they did not stress the point nor did they argue, that by reason of lapse of time and the use that was made of the new channel (B to D), they had ceased to be liable for any original diversion or obstruction to the natural channel at B, if such there was on their part. Moreover, in their discussion of the further point that no act of commission or omission on their part was a proximate cause of the injury to plaintiffs, the railroads did not advert at all to the fact that plaintiffs, in their complaints, had alleged that they would not have sustained any injury had it not been for the presence of the dike on the northerly side of the new channel. We pause briefly to state that the evidence on the first appeal disclosed, and the court conceded, that this dike was constructed and maintained by the district alone on an easement owned by it. We do not now stop to discuss what effect these matters of fact should or would have had on the court had they been brought to its attention.

The case upon the second trial below was heard on the original complaint notwithstanding (1) it charged all the defendants (the district as well as the railroads) with a joint liability and (2) averred that had it not been for the con-

struction by all of the defendants of the 15-foot dike none of the plaintiffs would have sustained any damage. The latter averment was not merely an allegation by the plaintiffs that *the* proximate cause of the injuries sustained by them was the construction of the dike, but it was also a binding judicial admission against the plaintiffs. Yet the evidence is undisputed that it was the Los Angeles Flood Control District which purchased the 25-foot strip of land that ran a distance of 1674.11 feet immediately adjacent to the north of the new ditch and erected the dike thereon and that the railroads had no part in it. If then the dike was *the proximate cause* and it alone was constructed and maintained by the district it is clear that the railroads were not proximately liable, as by the pleading they were absolved from liability, unless in fact they had joined in the construction and maintenance of the dike, which as stated is not the fact.

Upon the instant appeals before us the railroads assign as major errors (1) the failure of the trial court to direct a verdict; (2) the refusal of the court to permit the jury to consider, on the question of defendants' liability, the evidence introduced tending to show that the owners of the Adams Ranch caused the diversion of the channel away from its natural course; (3) errors in the instructions; and (4) that appellants James, Mueller, Tonso, Weck, Reinert and W. R. Kratka, as successors in interest of Platt were bound by his ratification of the diversion as evidenced by the so-called Platt contract with the railroads.

We are confronted at the outset, as just indicated, with the problem whether the trial judge ruled erroneously when he refused to direct a verdict for the railroads. This particular problem is beset with difficulties for us, as it undoubtedly was for the trial judge. Initially, we feel called upon to consider whether "the law of the case" as made upon the first appeal, binding alike upon the trial judge as it is upon us, required the submission of the case to the jury. In our view, it did not for reasons presently to be stated.

■ The rule in this state is that the law of the case comprehends only such facts and legal points as are presented to and decided upon a reversal. (*Moore* v. *Trott,* 162 Cal. 268 [122 P. 462]; *Steelduct Co.* v. *Henger-Seltzer Co.,* 26 Cal.2d 634 [160 P.2d 804].) For instance, if in an action upon a promissory note the defendant pleads payment and the evidence on that question is conflicting, a court on appeal would necessarily rule it was a jury question, where the trial court

had directed a verdict for the defendant. If, however, on the second trial the defendant had amended his answer, setting up that the action was barred by the statute of limitations and sustained it by uncontradicted proof the trial court would be under a duty to direct a verdict. This for the simple reason that the appellate court had directed a jury trial on one issue alone, to wit, the issue before it. The question then whether there had or had not been a diversion on the part of the railroads was ruled on the first appeal to be a jury question. But the basic question now before us whether such a diversion, if shown, created a continuing legal liability in view of the facts now before us, was not ruled upon. As the motion below and the appeal likewise have raised that point we proceed to a discussion of it.

If we assume, for the moment, that the railroads in 1907 blocked the natural drainage ditch from B to C and so caused the waters to flow from B to D and then on easterly, we are met with the question whether liability may still stem from the original act of diversion. In 1907 the natural channel from A to B was only about 30 feet in width from bank to bank with a maximum depth of about 4 feet. That the railroad thereafter excavated from time to time, the channel from B to D is the record in this case. It not only removed sand and boulders from it, but before 1936 had widened it quite considerably. If the old natural channel (A, B, to C) was sufficient to carry all storm waters within its banks we fail to see that the diverter was under a duty to construct an artificial ditch which would carry more than the same amount of water without overflowing its banks. We find it hard to believe that one who constructs an artificial ditch is under an obligation to build it so large and so secure that it will carry all the water that may artificially be diverted into it for all time. On the contrary we think that when an artificial ditch has been in operation for as long as 36 years, as is the case here, it must be held that the original act of diversion is no longer a basis of liability and must be classed as if it has just faded away. We think this is particularly true, where as here, the railroads could not reinstall the trestle, or clean out the old ditch and thereby permit the waters to be cast onto the land which is known in the record as the Adams Ranch and where it is plain that the jurisdiction and control over the old and new ditch are exclusively with the district.

While it has been said, particularly in cases decided decades ago, that liability for diversion never ceases, we think

it cannot be said to be the rule today. (*Cf. Barkley* v. *Wilcox,* 86 N.Y. 140 [40 Am.St.Rep. 519] ; 3 Farnham, Waters and Water Rights, § 889d, p. 2606.) Moreover, these early cases dealt for the most part with the diversion of streams valuable for their waters. As there is a vital distinction between diverting waters from a watercourse and guarding against storm or flood waters, we turn to expand a bit further on the subject.

■ Since very early times it has been a well-established principle of law that waters flowing in a stream in a natural watercourse through or adjoining a person's lands could not be diverted by upper landowners to the damage of lower riparian landowners. The reason back of this rule is self-evident. The pivotal question in every such case has been whether or not there is in fact a watercourse. Hence, the courts were early compelled to define what was meant by the term "watercourse" and quite naturally held that "a water course is a stream of water of such well-defined existence as to make its flow valuable to the owners of land along its course" (3 Farnham, Waters and Water Rights, § 878, p. 2556, n. 1. See, also, vol. 2, § 459, p. 1562; see, also, *Hellman Commercial Tr. & Sav. Bank* v. *Southern Pac. Co.,* 190 Cal. 626 [214 P. 46].)

A natural stream of water, generally speaking, is something of value to lands adjacent to its course. But such a stream when augumented with storm or flood waters is quite the reverse, unless there is a need for such excess waters. Hence, the courts quite naturally held that adjacent landowners along the watercourse were enttiled to erect barricades on their lands to prevent storm or flood waters in such a natural watercourse from inundating or otherwise damaging them. This was in no sense a diversion of the waters, but rather an endeavor to confine the waters to their channels.

From what has been said it is apparent that to speak of Eaton's Canyon Wash as a watercourse is a misnomer, but quite too often the courts have done so because in large measure the rules applicable are the same. But in truth the "Wash" in this case was merely a natural drainage ditch; i. e., the natural course taken by storm and flood waters which flowed only more or less periodically. Such waters, being entirely annual and intermittent, possessed no value to lands adjacent to the course they tended to follow, as for instance, a natural ditch created by their more or less periodic flows.

■ Storm or flood waters are not surface waters although before flowing in the channel of a ditch they may have been of that character. "The chief characteristic of surface water is its inability to maintain its identity and existence as a water body" (3 Farnham, Waters and Water Rights, § 878, p. 2557, n. 7, citing *Gray* v. *McWilliams,* 98 Cal. 157 [32 P. 976, 35 Am.St.Rep. 163, 21 L.R.A. 593] ). "The weight of authority, as well as of reason, is that flood water is not, and cannot be treated as, mere surface water" (3 Farnham, Waters and Water Rights, § 879, p. 2558). "Flood water . . . must be treated as in a class by itself, and it cannot be treated either as a water course or as surface water" (§ 879, p. 2559, n. 8). Upon these premises how should storm or flood waters, not flowing as a part of a natural constant stream of water and without value to property owners along the drainage ditch, be treated? In an endeavor to solve the problem the early decisions in this country accepted the doctrine of "no diversion of waters from a natural watercourse" as being a sufficient and all embracing guide. But those decisions were rendered at a time when the country was largely unsettled or agricultural and not urbanized, as was the case in California in its early days. But we have come upon a new era with new problems which cannot be settled by the laws of nature with respect to the flow of storm and flood waters, where man today is able to block those laws. Storm and flood waters which a century ago could readily have been absorbed by the great open spaces where they normally flowed are now blocked with huge cities and so must seek—in effect—artificial channels as they flow according to the laws of gravity. ■ We should not hold back the normal development and improvements of lands by saying to those who divert natural drainage ditches into artificial ones that liability for diversion never ceases. If at the time of the diversion the artificial channel is adequate to care for all reasonably anticipated storm or flood waters under the then existing conditions of the landscape it should be deemed adequate. There should be no obligation to construct the artificial channel so large and so efficient that it will care for excess storm and flood waters which may flow into it caused by subsequent artificial conditions such as the building of cities and highways which prevent absorption by the lands of such waters and so artificially increase their flow.

We are not without support for these views in the decisions of this state. In *San Gabriel Valley Country Club* v. *Los*

*Angeles,* 182 Cal. 392 [188 P. 554, 9 A.L.R. 1200], the waters of Eaton Canyon were diverted in part, as here, from their natural course by the construction of a storm drain. As a result the waters formed a channel which passed through the grounds of the plaintiff club where they had never passed before. Later on the defendant improved the channel. In speaking of the channel the court said: "In any event, it has now existed for such a length of time as the channel for the natural drainage of the watershed tributary to it, that the manner of its creation is not material, and it has all the attributes of a water channel wholly natural in origin." So in *Chowchilla Farms, Inc.* v. *Martin,* 219 Cal. 1 [25 P.2d 435], it was held that where waters had been diverted through an artificial canal for a number of years, it would be regarded as though it were a natural course. In the course of its opinion the court quoted from 1 Wiel on Water Rights, section 60, in part as follows: " 'There is further an established principle that by lapse of time an artificial watercourse may come to be regarded as equivalent to a natural one. These cases do not depend exactly upon prescription, for, as above shown, prescription, properly speaking, cannot run in favor of lower parties upon a flow as against parties higher up. They rest rather upon what some of the cases call ordinary dedication to a class of public which, in the course of time, has established itself upon the basis of the artificial condition. Where the creator of the artificial condition intended it to be *permanent,* and a community of landowners . . . has been allowed to adjust itself to the presence and existence of the . . . artificial condition, acting upon the supposition of its continuance, and this has proceeded for a long time beyond the prescriptive period, the new condition will be regarded as though it were a natural one, its artificial origin being then disregarded by the law as it has been by the community.' "

Quite regardless of what has so far been said we are of the opinion that the case, in any event, must be reversed upon the ground that the trial court committed reversible error (1) in its refusal to admit for all purposes evidence as to the barricade constructed by the owners of the Adams Ranch; (2) in the instructions given to the jury; and (3) in not holding as a matter of law that appellants James, Mueller, Tonso, Weck, Reinert and W. R. Kratka could not recover in view of the Platt contract and the ratification thereby of the diversion.

As has already been indicated, the trial court admitted evidence which disclosed the erection of the barricade upon

the Adams land by the occupant thereof and evidence tending to prove that this act alone caused the channel to silt up and that it was the original proximate cause which turned the waters so that they flowed from B to D. The trial judge, however, permitted this evidence not to prove the inherent facts, but for the limited purpose of showing that on March 3 and 4, 1943, "there was no wash south of the railroad tracks."

The statement just quoted was made by the court to the jury at the time of its admission, with this further statement: ". . . the evidence is not admitted for the purpose of indicating at all, ladies and gentlemen, that because somebody else did something the Southern Pacific or the Southern Pacific Railroad Company is excused from anything they did or failed to do. It is admitted solely in connection with the claim of the defendant that there was no wash south of the railroad tracks. *You are to understand that the reception of this evidence, if established, does not in any wise relieve the Southern Pacific Company or the Southern Pacific Railroad Company for anything they did or failed to do.* Now, I am not indicating at all to you that they did or failed to do anything, that is up to you to decide, but the fact that somebody else did something or did not do something has no bearing *on their liability,* the liability of the defendants in this case, or either of them . . ." (Italics supplied.)

The trial court, as appears from the transcript, proceeded upon the theory that the railroads and the owners of Adams Ranch were joint tort feasors, even if the latter initially blocked the natural channel (B to C) and hence that the railroads could not shift their liability by a showing of the true fact. The ruling would have been correct if the parties were shown to have been joint tort feasors, but that necessary premise was lacking and consequently the ruling was not only erroneous, but highly prejudicial. ▮ In order that two or more persons (including corporations as persons) may be said to be joint tort feasors it is essential that it be shown that the parties acted in concert to achieve a result or that the actor was authorized by the other to act in his behalf. ▮ Here the action of the owners of the Adams Ranch was not shown to have been participated in or authorized by the railroads. The fact, if it be a fact, that the owners of the Adams Ranch blocked the natural drainage course and prior, or subsequent thereto the railroads did likewise, if they did, would not in and of itself show that the parties were acting in concert and as a consequence could be held to be joint tort feasors. As

the proper premise was wanting the conclusion was erroneous. (*Cf. Thome* v. *Honcut Dredging Co.*, 43 Cal.App.2d 737 [111 P.2d 368]; *California Orange Co.* v. *Riverside Portland Cement Co.*, 50 Cal.App. 522 [195 P. 694]; *Wm. Tackaberry Co.* v. *Sioux City Serv. Co.*, 154 Iowa 358 [132 N.W. 945, 134 N.W. 1064, Ann.Cas. 1914A 1276, 40 L.R.A.N.S. 102]; 56 Am.Jur. 522, 523.) Accordingly, the railroads were entitled to introduce evidence to show that the owners of the Adams Ranch blocked the course of the natural drain and that this, without any action on their part, was the proximate cause of the diversion of the channel from B to C to the new channel B to D. The railroads were under no duty to eliminate the blockade so long as it was not caused by their trestle or any other act on their part. The railroads could accept the results of the blockade without taking any affirmative action to eliminate it. ■ Railroads, like any other private owner of lands, are under no duty to go into a natural drainage channel or ditch and remove therefrom debris, sand and boulders which interfere with the free flow of waters so long as they have not erected or placed therein any obstruction to such flow. This is elemental law. ■ If, as the railroads contended, the owners of the Adams Ranch, by means of the barricade, caused the natural channel to silt up on the north side of the right of way, underneath the trestle and on the south side of the right of way and thus caused the diversion, they were entitled to show those facts, if they could. If as is contended, the railroads removed the timbers of the trestle and filled in the spaces occupied by such timbers such action gave rise to no legal liability, if the action of the owners of the Adams Ranch initially was alone sufficient to divert the channel so that it followed the course B to D rather than B to C. The railroads on such an hypothesis of facts may not be said to have adopted the acts of the actors in the scene. They merely accepted an existing condition and made use of it, for their own purposes, without expanding upon it. Accordingly, the refusal on the part of the trial court to accept the facts as tending to show a want of legal liability on the part of the railroads was prejudicial error. If the jury had been permitted to consider the facts on the basis of legal liability it might well have concluded that the owners of the Adams Ranch rather than the railroads created the diversion.

In view of what has been said it is unnecessary to discuss the error in refusing to give certain requested instructions and additional errors assigned by appellants.

As we are firmly of the view that the court should have directed a verdict for the defendant railroads, the case is reversed with instructions to enter up a judgment for the defendants notwithstanding the verdict. The appeals from the minute order and order denying motion for new trial are dismissed.

White, P. J., and Drapeau, J., concurred.

A petition for a rehearing was denied June 25, 1951, and respondents' petition for a hearing by the Supreme Court was denied August 2, 1951. Shenk, J., and Carter, J., voted for a hearing.