[Sac. No. 873. Department Two.—June 2, 1902.]

ANGELO SANGUINETTI, Respondent, v. WALTER R. POCK, Appellant.

DRAINAGE FOR SURFACE-WATER—LOCAL DEPRESSION—WATERCOURSE.—An ordinary local depression, or swale, in the surface of a generally level plain, through which the rainfall on plaintiff's land was drained over the defendant's land, is not a watercourse, to constitute which there must be a natural stream of running water usually flowing in a particular direction and in a definite channel.

ID.—EASEMENT FOR DISCHARGE OF SURFACE-WATER.—The owner of upper land has an easement for the discharge of surface-water caused by rainfall, as it is accustomed naturally to flow over the surface of lower adjacent land; and the owner of the lower land has no right to interrupt such flow to the injury of the upper owner.

ID.—PROTECTION OF LOWER OWNER FROM FLOOD-WATER—BACK-WATER.—The lower owner of land has the right to protect his land from flood-water, arising from the overflow of a natural stream, even if it causes the water to back upon the surface of the land above.

ID.—CONSTRUCTION OF LEVEE—FLOOD-WATERS FROM SLOUGH—DITCH FOR RAIN-WATER.—Where the depression in the surface of the land both caused the rain-water to flow from plaintiff's land over the defendant's land, and also caused the flood-water from a slough to flow over the defendant's land, and the defendant constructed a levee, causing the water to back over plaintiff's land, the defendant has only the right so to protect himself from the flood-water, and he must provide a sufficient ditch, or canal, to carry off the rainfall from plaintiff's land over the depression as it would naturally flow.

APPEAL from a judgment of the Superior Court of San Joaquin County and from an order denying a new trial. Edward I. Jones, Judge.

The facts are stated in the opinion.

R. W. Dodge, A. H. Carpenter, and Carpenter & Flack, for Appellant.

Nicol, Orr & Nutter, for Respondent.

CHIPMAN, C.—Action to have a certain levee constructed by defendant declared to be a nuisance and for damages. A jury was called to determine certain special issues and the

court also made findings of fact.  The following diagram will
illustrate the facts:—

DEFENDANT'S EXHIBIT "A"

MORMON  SLOUGH

MARIPOSA ROAD

CREANER     POCK

SONORA ROAD

H

POCK     A

HEWLETT

E

F     SANGUINETTI

C: SHIPPEE DITCH     POCK DITCH     B   G   FRENCH DITCH

HEWLETT     HEWLETT     W. A. FRENCH

Summarized from the findings, it appears that plaintiff
and defendant own adjoining lands, as shown by the diagram;

a natural waterway passes through these lands; its course is
from east to west, and it extends eastward some distance east
of the Mariposa road and westward through defendant's land,
and "in its natural condition was sufficient to conduct and
carry away the waters which naturally accumulated thereon,"
and "the waters which accumulated in said waterway were,
by means thereof, conducted and carried away from plain-
tiff's lands, and such waters were thereby prevented from
accumulating on or flooding the lands of plaintiff."     In
December, 1896, defendant constructed a dam and levee
across the bed of said waterway at the point where it enters
defendant's lands by means of which the water was ob-
structed in its flow, was diverted from its channel where it
was accustomed to run, and was made to back upon and over-
flow plaintiff's lands to the injury of his crops during the
year 1897 in the sum of forty dollars.  Defendant continues
to maintain his said levee and threatens so to do, and will thus
deprive plaintiff of the enjoyment of his said land.  The land
of plaintiff and defendant is not situate on a plain substan-
tally level and unbroken by waterways, but the land of plain-
tiff is higher than the land of defendant, "and through said
land passes said waterway, by which the waters naturally
accumulating on plaintiff's lands have been conducted and
carried away."  Mormon Slough is a river, and is a branch
of the Calaveras River, and flows nearly parallel with said
waterway from east to west and about one mile distant on
the north.  "In seasons of high water the water flowing in
Mormon Slough overflows the banks thereof and by means
of the said waterway reaches the lands of the plaintiff, from
whence such waters pass by means of the said waterway
through defendant's lands."  Plaintiff's crop was injured
"in part by water coming from said Mormon Slough at a
time of freshet," but "said flow was not unusual or extraor-
dinary for the season of the year when and where the same
occurred."  In the year 1896 defendant constructed along the
eastern boundary of his land a levee and canal, or ditch,
which at the south end connected with another ditch on the
lands of S. Hewlett, but said ditch "is not sufficient to carry
the waters which naturally fall, flow, or accumulate on the
lands of plaintiff."

As conclusions of law, the court found that the levee of

defendant is a nuisance, and plaintiff is entitled to have it abated and the restoration of the waterway to its former condition, and that defendant be restrained from further constructing or maintaining said levee; also to recover forty dollars damages. Judgment was accordingly entered. The appeal is by defendant from the judgment and the order denying his motion for a new trial.

Defendant contends that there is no watercourse as found, but that the so-called waterway is but an ordinary depression in the surface of the generally level plain constituting. defendant's and plaintiff's and the surrounding lands, and that the findings on this point are not supported by the evidence; that the levee complained of was constructed to keep the flood-waters of Mormon Slough from invading his land, which he had a right to do, and that the canal, or ditch, dug by him along the levee was of ample capacity to carry off the waters that naturally fall and accumulate on the lands of plaintiff.

There are two principal questions presented to which counsel have chiefly devoted their attention: 1. Is the drainway mentioned in the findings shown by the evidence to be a watercourse, as defined by the courts, which defendant had no right to obstruct to protect his lands either against the ordinary rainfall flowing down this stream or the flood-waters of Mormon Slough? 2. If no watercourse existed, had defendant the right to obstruct what he concedes was a depression in the land through which the rainfall accumulating on plaintiff's land was accustomed to flow over defendant's land? Briefly, had defendant the right to levee against the ordinary rainfall and also against the flood-waters of Mormon Slough?

1. It is settled law in this state that plaintiff as the owner of the upper land has an easement over the lower adjacent land of defendant to discharge surface-water as it is accustomed naturally to flow, and defendant had no right to interrupt such natural flow to plaintiff's injury. (*Ogburn* v. *Connor*, 46 Cal. 346;[1] *Gray* v. *McWilliams*, 98 Cal. 157;[2] *Los Angeles etc. Assn.* v. *Los Angeles*, 103 Cal. 461; *Cushing* v. *Pires*, 124 Cal. 663; *Larrabee* v. *Cloverdale*, 131 Cal. 96.) The evidence was without substantial conflict that the de-

[1] 13 Am. Rep. 213.    [2] 35 Am. St. Rep. 163.

pression, or so-called watercourse, running through defendant's and plaintiff's lands, was a natural drainway for the water accumulating from rainfall on plaintiff's lands, and that by constructing his levee across this swale, or drainway, the effect was to stop the flow of such water and to cause it to back over plaintiff's land to his injury.    Defendant constructed a canal, or ditch, along this levee its entire length, on his own land, which but for its defects would probably be ample to carry away the water ordinarily falling from the clouds and accumulating on plaintiff's land; and if of sufficient capacity to carry this water, it is not claimed that the levee would injure plaintiff by reason of its being an obstruction to the passage of water ordinarily and usually accumulating on plaintiff's land.    The evidence is conflicting on the point, but we think it sufficient to support the finding that defendant's said ditch had not capacity to carry the said waters at the time of the injury.    Engineer Atherton, a witness for plaintiff, testified that its bottom was not brought down to an even and regular grade; that not far south of the point where the levee crosses the drainway the bottom of the ditch is a foot higher than the bottom of the drainway, and at the southeast corner of defendant's land, where the ditch turns west, thence connecting at a point on defendant's west line with Hewlett's ditch, the bottom is fourteen inches higher than the bottom of the drainway, and the grade of the ditch is towards the south.    The capacity of this ditch, obviously, would be measured by its capacity at these points where its bottom is highest, or where the least water would pass in a given period of time.    If there were no other question in the case we should have no difficulty in holding that the evidence justified the findings that the levee is an unwarranted obstruction, and will so continue to be until the ditch referred to is made of sufficient capacity to carry the water accumulating from rainfall on plaintiff's land, and which is accustomed to flow down this drainway.

2. I do not think the evidence warrants the finding that the depression, or swale, referred to is a watercourse in contemplation of law.    Several witnesses testified that it is a watercourse, and the court and jury so found.    But whether it is a watercourse in legal contemplation must be determined as matter of law from the evidence in the case.    The tes-

timony of Engineer Atherton is, that he examined it carefully, and was able to trace and meander it for a distance of two and a half miles east of plaintiff's lands and through defendant's lands; that it varies in width from seventy-five to one hundred feet, averaging eighty feet, and has a depth varying from six inches to two and one-half feet; its general course is about parallel with Mormon Slough; its banks, if they can be so called, we learn from other witnesses, slope gently, as is obvious from the width and depth, and lose themselves in the surrounding land, and when water is not running the depression is cultivated to grain, the same as the other land of plaintiff and defendant, and a portion of the depression, on plaintiff's land, is planted to vines; where it begins and where it ends does not appear, and there is no satisfactory evidence to show that it has any direct connection with Mormon Slough. The country around and about the lands of plaintiff and defendant is level, and all the land in the vicinity is subject to overflow occasionally from Mormon Slough, which is a branch of Calaveras River, and carries a large body of water. When Mormon Slough overflows, which occurs occasionally at high-water periods, in the winter and spring months, its waters spread out generally over this region of country and inundate plaintiff's and defendant's lands in common with the lands of their neighbors, and this drainway fills up. The waters thus escaping from Mormon Slough run west and southwest, the slope of the country being slightly in that direction, and, after passing over the lands referred to, go on westward and find their way to the San Joaquin River or Mormon Slough, further to the westward. At such times this drainway, in common with the other land, is completely submerged. One of these overflows occurred in 1897, at which time plaintiff's land was damaged, as found by the jury, and it was found also that the damage in part occurred from the water of the Mormon Slough, which, it is to be inferred, but was not shown by any evidence, was commingled with the water that had accumulated on plaintiff's land from rainfall.

A watercourse is defined to be "a running stream of water; a natural stream, including rivers, creeks, runs, and rivulets." (Black's Law Dictionary, title "Watercourse.") Further defining the term, this court said: "There must

be a stream, usually flowing in a particular direction, though it need not flow continually. It may sometimes be dry. It must flow in a definite channel, having a bed or banks, and usually discharge itself into some other stream or body of water. It must be something more than a mere surface drainage over the entire face of the tract of land, occasioned by unusual freshets or other extraordinary causes. It does not include the water flowing in the hollows or ravines in land, which is mere surface-water from rain or melting snow (i. e. snow lying and melting on the land), and is discharged through them from a higher to a lower level, but which at other times are destitute of water. Such hollows or ravines are not, in legal contemplation, watercourses.'' (*Los Angeles etc. Assn.* v. *Los Angeles,* 103 Cal. 466; citing text-books and cases.) The evidence does not bring the depression, or swale, in question within this definition. This so-called watercourse is nothing more than a local drainway to a limited amount of land which has neither a definite beginning nor ending, and is like hundreds of similar swales found in land whose surface may be called generally level. While such drainways may not be closed by the owner of the servient tenement to the detriment of the dominant tenement, it is not because they are watercourses, but it is on the principle stated in *Ogburn* v. *Connor,* 46 Cal. 346,[1] and *Los Angeles etc. Assn.* v. *Los Angeles,* 103 Cal. 461, and other cases. We are thus brought to the question whether defendant had a right to protect his land against the flood-waters of Mormon Slough. The evidence is, that he built his levee for this purpose, and through no intention of injuring plaintiff. Mormon Slough has characteristics similar to those of the Sacramento River stated in *McDaniel* v. *Cummings,* 83 Cal. 515, cited in *De Baker* v. *Southern Cal. Ry. Co.,* 106 Cal. 257.[2] The situation of plaintiff's and defendant's lands in the present case, with reference to Mormon Slough, is much the same as was the situation of the lands of the parties in the case cited with reference to the Sacramento River; the effect of the overflow of Mormon Slough upon these lands is, in its essential features, the same as was the overflow of the Sacramento River on the lands in *McDaniel* v. *Cummings.* In that case the defendant built a levee to accomplish the

[1] 13 Am. Rep. 213.          [2] 46 Am. St. Rep. 237.

same object as defendant had in this case and with like results,—namely, it tended to hold the water back on plaintiff's land longer than it would have remained had the levee not been constructed. The court in deciding *McDaniel* v. *Cummings* adopted the rule in *Rex* v. *Commissioners etc.*, 8 Barn. & C. 355, and as stated in *Lamb* v. *Reclamation Dist.*, 73 Cal. 125,[1] with respect to the waters of the sea,—namely "that they are a common enemy against which every man has a right to defend himself, regardless of the fact that the barriers he erects for the protection of his land may cause the flood to rise higher and flow with greater force upon his neighbor." It is true, in the McDaniel case the court said the rule was applicable, "especially in view of the policy of all our state legislation respecting overflowed lands," and it is also true that the lands in question here were not swamp and overflowed lands. But we cannot see that the principle finds its origin in or is applicable only in cases where title has come to the owner in a certain way. The principle is of general application. It was shown by the court that there was no necessary conflict between the views expressed in the case referred to and the decision in *Ogburn* v. *Connor*, since that decision refers only to surface-water having its sources in springs or descending from the clouds. "It does not apply to flood-waters, which the owner of the higher land can restrain by the same means employed by his neighbor." And it was said: "What is true of the owner of the river-bank is true in the same sense of each successive owner back of him. It is the interest of all to combine and share the expense of placing a levee on the bank by which all will be protected, but if those in front will not co-operate with those behind, and will do nothing for themselves, they must not be allowed to stand in the way of those whose necessities compel them to act."

Our conclusion on the main question at issue is, that defendant had no right to obstruct the drainway as against the flow of water accumulating on plaintiff's land from rainfall (melting snow need not be mentioned, as no snow of consequence ever falls in that part of the San Joaquin Valley) without first providing a ditch, or canal, of sufficient capacity to carry such water as the said waterway was ac-

---

[1] 2 Am. St. Rep. 775.

customed to carry to relieve plaintiff's lands. But defendant had the right to protect his land from the overflow waters of Mormon Slough by a levee. As a new trial must be granted, a question may arise as to defendant's liability upon evidence showing that concurrently with the overflow of Mormon Slough there was a heavy rainfall, which latter was sufficient to tax the capacity of said waterway. It is perhaps enough to say that plaintiff can recover damage only by showing that when the injury occurred there was flowing in the waterway sufficient water to fill it, which had accumulated on his land. Defendant may meet such evidence by showing that his ditch at that time had capacity to carry all the water the drainway would carry. To prevent any restraining order as to the future, defendant may show that he has since (if he had not at the trial) so constructed his ditch as to carry all water to the full capacity of the said drainway. This much may safely be said to result from the principles already decided by this court, to which reference has been made. The other questions raised by the appeal do not call for discussion in view of what has already been said.

The judgment and order should be reversed and a new trial ordered.

Cooper, C., and Haynes, C., concurred.

For the reasons given in the foregoing opinion the judgment and order are reversed and a new trial ordered.

McFarland, J., Temple, J., Henshaw, J.