[L. A. No. 16802. In Bank.—August 1, 1940.]

FRANK MOGLE et al., Respondents, v. OLIVER B. MOORE et al., Appellants.

(1)

4

Stead & Boileau, Charles R. Stead, R. Bruce Findlay and Will G. Fields for Appellants.

James L. King for Respondents.

THE COURT.—The appeal in this case was originally heard by the Fourth District Court of Appeal. Following a decision by that court, a petition for hearing by this court was granted. Consideration of the several points of law that have been presented by the respective parties to the litigation has resulted in a conclusion that the appeal was correctly decided by the District Court of Appeal. Its opinion rendered therein, which was prepared by Mr. Justice Marks of that court, is therefore adopted by this court as its own. It is as follows:

"This is an appeal from a judgment restraining Oliver B. Moore and Marjorie E. Moore, whom we will refer to as the defendants, from protecting their property from overflow from surface waters and from waters which escape from a watercourse known as West Cucamonga creek.

"The appeal is on the judgment roll. Under well-settled rules of law we are required to presume that the evidence supports the findings in every particular.

"Plaintiffs are owners of two tracts of land lying about seven miles southerly from the city of Upland in San Bernardino county. These parcels of land are separated by a strip of land called 'Comet Avenue'. Defendants own two parcels of land adjoining plaintiffs' property on the north. These two parcels are also separated by Comet avenue.

"Comet avenue is a strip of land twenty feet wide and extends in a northerly and southerly direction. We are not informed as to the location of its termini. From the findings we gather that there was no evidence showing it had been either dedicated or accepted as a public street or road.

"The country in question here is practically level with a general slope to the southwest from north of the city of Upland to beyond the properties of the parties involved in this controversy. While there are no findings on this point, the following facts are of such common and universal everyday knowledge to people living near to or familiar with the general topography of this country that we may take judicial notice of them. (*People* v. *Tossetti*, 107 Cal. App. 7 [289 Pac.

881].) A range of mountains extending in a general easterly and westerly direction rises abruptly from the valley floor a few miles north of the city of Upland. Many canyons empty from these mountains in a general southerly direction. The grade of descent of the land southerly is sharp at the base of this range but is reduced as the distance from the mountains increases. Numerous washes, streams and watercourses from the canyons emptying from the mountains extend into and some of them across the valley floor and during periods of heavy rains carry a considerable volume of water. With these general observations we may proceed to a consideration of the findings of fact made by the trial court.

''Comet avenue, as it runs between the two parcels of land of defendants, is marked, in its center, with a row of eucalyptus trees. It is unmarked between the lands of plaintiffs and has been cultivated and used by them and their predecessors. The natural surface of Comet avenue has about the same elevation as the abutting property. The trial court found that 'there is no natural water channel, ditch or course upon' Comet avenue as it extends between the parcels of land owned by the respective parties hereto.

''The rainy season of 1936–1937 commenced in November, 1936, and ended in March, 1937. Between those dates defendants constructed a fence along their property abutting on the west side of Comet avenue. This fence was constructed of 'wooden posts and strands of woven and barbed wire' and tended to obstruct the flow of the 'surface waters' on Comet avenue 'from flowing along the general slope of defendants' land lying west of said fence, by reason of the collection and accumulation of weeds, grass, debris, sand and silt lodging against the same, and diverting the natural flow of said surface water into and along said ''Comet Avenue'' and down to and upon the lands of plaintiffs'.

''The trial court also found that during the rainy season of 1936–1937, surface waters carried onto and deposited upon Comet avenue extending between defendants' parcels of land, and on the east one hundred fifty feet of the north two-thirds of their west parcel, large quantities of sand and silt; that this deposit ranged in depth between one and two feet; that defendants removed this sand and silt from Comet avenue, to the original surface of the ground with a width of from three to five feet, thereby creating an artificial channel in Comet

avenue; that through such channel 'a large portion of said surface waters flowed to and upon plaintiffs' said land in a manner and at points where it had not theretofore flowed, and carried with it large quantities of sand, silt and debris, depositing the same upon plaintiffs' said land; that said artificial channel or ditch together with said fence obstruction prevented said surface waters from flowing in a south and southwesterly direction across defendants' land along the general slope thereof'; that defendants 'threaten to continue to construct, dig and maintain said artificial ditch and channel' so that the 'surface waters' would continue to flow to and over defendants' [plaintiff's?] land to their serious damage. The trial court further found that the waters flowing from the channel on Comet avenue over plaintiffs' property were not flood waters; that part of those waters arose upon and came from three named sections of land; that none of those waters were flood waters which arose in the foothills north and east of Upland.

''The trial court further found that there had existed since time immemorial in Cucamonga valley a natural creek bed known as West Cucamonga creek which 'was a branch or a portion of the creek or stream of water running out of Cucamonga Canyon'; that at all times there was a continuous stream of water in the stream bed flowing out of Cucamonga canyon and that 'prior to 1916 a portion of the waters from said stream flowed down through that certain channel known as West Cucamonga Creek'.

'' 'That in or about 1916 the waters from the stream flowing out of Cucamonga Canyon were artificially diverted and checked by dams and spread over large areas of land at the foot of the mountains, and that at all times since 1916 by reason of said artificial diversion, the waters of said stream no longer flow into the channel of West Cucamonga Creek, except infrequently in times of storm, and when the waters break over or out of the check dams in said spreading ground, or at such infrequent times as the waters are turned into said channel through flood gates.

'' 'That said channel formerly carrying the waters of said West Cucamonga Creek, now exists upon the surface of the land as it has existed from time immemorial, but that there are no longer waters flowing in said channel, nor has there been since about 1916, except as hereinbefore found, and ex-

cept after rain periods, at which times a flow of water, originating largely from the rain waters falling on the streets of the City of Upland, and surrounding territory, by natural flow drain into said channel, and at which time said waters accumulate into a large body of water, and flow down through said channel to a point where said channel reaches Comet Avenue, extended north to the property of John G. Clock, which said point is approximately six miles south of the City of Upland and approximately one mile north of the lands of the defendants.

" 'That at the point where said channel intersects Comet Avenue upon the property of John G. Clock as aforesaid, the said stream originally flowed in a southwesterly direction. That since the year 1926, Comet Avenue, from said point of intersection southerly, has been cleared out and artificial dikes have been constructed from time to time along the sides thereof by the adjacent property owners southerly to the defendants' property, and that by the year 1935, all the waters flowing in said channel flowed directly south along Comet Avenue to the north boundary of the defendants' property which adjoins Schaefer Avenue on the south thereof.

" 'All of the waters so flowing in said channel, flow in a well-defined body from a point where they enter the said channel at or near the City of Upland, California, to the defendants' property, and that none of the said waters once having reached said channel escape therefrom from the time that they enter therein until they reach the intersection of Comet Avenue and the north line of the defendants' property. All of said waters, except such as are lost by percolation in the stream bed, flow in a continuous stream through said channel as aforesaid to the north line of defendants' said property, where said channel ceases to exist and such quantity of water as has flowed out of the end of said channel, has continued down Comet Avenue on the surface of the ground, for a short distance south of Schaefer Avenue and then spread out and flow southwesterly across defendants' said property, on the surface of the ground, following the natural slope of *his* said land.

" 'That no waters of any appreciable amount enter said stream south of the City of Upland, which said point is approximately six (6) miles distant from the lands of the defendants.'

8

"The findings clearly show that West Cucamonga creek is a natural watercourse extending from the mouth of Cucamonga canyon southerly and southwesterly to its intersection with Comet avenue on the John G. Clock property; that during or prior to 1926 its southwesterly course from that point had been obstructed and the stream waters turned south on Comet avenue and that since 1926 Comet avenue has been developed by neighboring property owners into a stream bed one mile long, extending from West Cucamonga creek to the north line of defendants' property; that in 1937 the waters of West Cucamonga creek followed the natural stream bed to Comet avenue, and through Comet avenue to defendants' property where their confinement into a stream of water ended; that they then spread, joining with the surface waters originating on the three named sections, and did the damage complained of.

"There is no definite finding or conclusion of law that the waters were surface waters after they left the original stream bed of West Cucamonga creek or the confinement of the channel on Comet avenue, but the trial judge described them as surface waters, and his ultimate decision cannot be rationalized under any theory other than that he reached the conclusion that those waters were all surface waters when they reached the properties of the defendants. The sole question necessary for consideration here is the character of those waters. Were they surface waters, stream waters or flood waters? We are not concerned with vagrant waters as such waters are not mentioned in the findings or in the briefs.

"West Cucamonga creek did not lose its character as a watercourse nor did its waters lose their character as stream waters after 1916, because the stream bed was dry for periods of time. (*Cederburg* v. *Dutra,* 3 Cal. App. 572 [86 Pac. 838].) It is thoroughly established in California that 'A constant flow of water is not essential to the existence of a watercourse.' (25 Cal. Jur. 1036, and cases cited.) It is sufficient if, during some seasons, water does in fact flow in the stream bed.

"Surface waters are defined as waters falling upon and naturally spreading over lands. They may come from seasonal rains, melting snows, swamps or springs, or from all of them. Surface waters consist of surface drainage falling on or flowing from and over a tract or tracts of land be-

fore such waters have found their way into a natural water-course. (26 Cal. Jur., p. 279, and cases cited.)

▪ ''A stream is a watercourse having a source and terminus, banks and channel, through which waters flow, at least periodically. Streams usually empty into other streams, lakes, or the ocean, but a stream does not lose its character as a watercourse even though it may break up and disappear. (*Hellman etc. Bank* v. *Southern Pacific Co.,* 190 Cal. 626 [214 Pac. 46].) Streams are usually formed by surface waters gathering together in one channel and flowing therein. The waters then lose their character as surface waters and become stream waters. (*Lindblom* v. *Round Valley Water Co.,* 178 Cal. 450 [173 Pac. 994] ; *Horton* v. *Goodenough,* 184 Cal. 451 [194 Pac. 34] ; *Gray* v. *Reclamation District No. 1500,* 174 Cal. 622, at p. 650 [163 Pac. 1024].) As we have observed, a continuous flow of water is not necessary to constitute a stream and its waters stream waters. (*San Gabriel Valley Country Club* v. *Los Angeles County,* 182 Cal. 392 [188 Pac. 554, 9 L. R. A. 1200].)

▪ ''Flood waters are thus correctly described in 26 California Jurisprudence 280; 'Flood waters are distinguished from surface waters by the fact that the former have broken away from a stream, while the latter have not yet become part of a watercourse. The term ''flood waters'' is used to indicate waters which escape from a watercourse in great volume and flow over adjoining lands in no regular channel, though the fact that such errant waters make for themselves a temporary channel or follow some natural channel, gully or depression does not affect their character as flood waters or give to the course which they follow the character of a natural watercourse.'

▪ ''It is also thoroughly settled that flood waters escaping from a stream are not surface waters and do not lose their character as flood waters while flowing wild over the country. In *Horton* v. *Goodenough, supra,* it was said: 'The waters are plainly flood waters breaking out of their channel and running wild, and as such each property owner threatened has the right to protect himself against them as best he can, under the authority of the decisions we have already cited, the most notable of which is *Lamb* v. *Reclamation District,* 73 Cal. [125] 126 [2 Am. St. Rep. 775, 14 Pac. 625]. The waters are not surface waters in the technical sense, for they have

already been gathered into a stream whence they have escaped.'

"A similar rule is announced in *LeBrun* v. *Richards,* 210 Cal. 308 [291 Pac. 825, 72 A. L. R. 336], with the added remark that 'Flood waters are those which escape from a stream or other body of water and overflow the adjacent territory.'

"The rules governing the right to obstruct the flow of the three classes of waters with which we are here concerned are clearly set forth in *Horton* v. *Goodenough, supra,* as follows:

" 'First, one has no right to obstruct the flow on to his land of what are technically known as surface waters. (*Heier* v. *Krull,* 160 Cal. 441, and authorities cited at page 444 [117 Pac. 530].) But by surface waters are not meant any waters which may be on or moving across the surface of the land without being collected into a natural watercourse. They are confined to waters falling on the land by precipitation or rising thereon in springs. Putting it conversely, they do not include waters flowing out of a natural watercourse, but which yet were once a part of a stream and have escaped from it— flood waters, in other words. (*McDaniel* v. *Cummings,* 83 Cal. 515 [8 L. R. A. 575, 23 Pac. 795]; Farnham on Waters, sec. 278.) Second, one has the right to protect himself against flood waters, that is, waters of the character last described, and for that purpose to obstruct their flow on to his land, and this even though such obstruction causes the water to flow on to the land of another. (*Barnes* v. *Marshall,* 68 Cal. 569 [10 Pac. 115]; *Lamb* v. *Reclamation District,* 73 Cal. [125] 126 [2 Am. St. Rep. 775, 14 Pac. 625]; *De Baker* v. *Southern Cal. Ry. Co.,* 106 Cal. 257 [46 Am. St. Rep. 237, 39 Pac. 610]; *Sanguinetti* v. *Pock,* 136 Cal. 466 [89 Am. St. Rep. 169, 69 Pac. 98].) Third, one may not obstruct or divert the flow of a natural watercourse. But by a watercourse is not meant the gathering of errant water while passing through a low depression, swale, or gully, but a stream in the real sense, with a definite channel with bed and banks, within which it flows at those times when the streams of the region habitually flow. (*Los Angeles etc. Assn.* v. *Los Angeles,* 103 Cal. [461] 466 [37 Pac. 375]; *Sanguinetti* v. *Pock, supra; San Gabriel Valley Country Club* v. *Los Angeles County,* 182 Cal. 392 [9 A. L. R. 1200, 188 Pac. 554]; *Simmons* v. *Winters,* 21 Or. 35 [28 Am. St. Rep. 727, 27 Pac. 7].)'

██ "When we apply these rules of law to the facts found by the trial court the following conclusions are inevitable: (1) West Cucamonga creek is a watercourse and the water flowing in it constitutes a stream; (2) The surface waters running off from Upland and vicinity become stream waters when they gather in West Cucamonga creek; (3) When the stream waters of West Cucamonga creek leave its watercourse in times of flood they become storm waters; (4) Those waters remain storm waters when running wild over the adjacent country.

██ "It makes no difference in the ultimate decision of this case, on the facts found, whether we do or do not regard the man-made channel on Comet avenue as a part of West Cucamonga creek and a watercourse. The facts found are not sufficient to determine that question. We will therefore assume that it was not a watercourse. The flood waters escaped from the original channel of the West Cucamonga creek at the John G. Clock property. They then became flood waters, the common enemy against which threatened property owners had the right to protect themselves. Those flood waters followed the man-made channel to the lands of defendants. On leaving that man-made channel they remained flood waters. Defendants had the right to protect their property against those flood waters even to the damage of plaintiffs, their lower neighbors. There is no finding that what defendants did to protect their property was improperly done. It follows that in so far as the judgment enjoins defendants from properly protecting their property from the waters escaping from West Cucamonga creek through the channel on Comet avenue, it cannot be sustained.

██ "The trial court, however, found that part of the damage to plaintiffs' property was caused by the obstruction of the flow of the surface waters originating on three named sections. This defendants had no right to do. (*Switzer* v. *Yunt,* 5 Cal. App. (2d) 71 [41 Pac. (2d) 974].) At another trial this phase of the case should be considered under the rules announced in *Sanguinetti* v. *Pock,* 136 Cal. 466 [69 Pac. 98, 89 Am. St. Rep. 169].

"Plaintiffs rely on such cases as *Thomson* v. *La Fetra,* 180 Cal. 771 [183 Pac. 152], *Larrabee* v. *Cloverdale,* 131 Cal. 96 [63 Pac. 143], *Board of Trustees* v. *Rodley,* 38 Cal. App. 563 [177 Pac. 175], and *Jaxon* v. *Clapp,* 45 Cal. App. 214 [187

Pac. 69]. These cases have only to do with the obstruction of the natural flow of surface waters. They cannot be controlling where, as here, we are principally concerned with the flow of flood waters.

■ "Plaintiffs also urge that the waters which flooded their property cannot be classified as flood waters because they did not escape over the banks of West Cucamonga creek during a period of great storms, but, either through an opening at the end of the creek, or through the end of the man-made channel on Comet avenue.

"We are not impressed with this argument. As we have already seen, stream waters escaping from the channel of a watercourse during periods of great storms become flood waters. That they cannot fall within any accepted definition of surface waters is clear whether they escape over the stream banks or at the end of the channel. Therefore, they are not surface waters. That they are not stream waters when they leave the channel is fully settled by the cases already cited. By this process of elimination we are forced to the conclusion that the waters which escaped from West Cucamonga creek could have been only flood waters. We are fortified in this conclusion by *Sanguinetti* v. *Pock, supra,* where it was held that storm waters which filled a natural swale, not a watercourse, retained the character of flood waters. A property owner may protect his property from overflow from flood waters.

■ "If we understand the effect of the judgment correctly, defendants are permanently restrained from removing the deposit of sand and silt which was precipitated by the storm waters onto Comet avenue and the northeasterly portion of their westerly tract of land thereby raising the natural grade between one and two feet. We know of no rule of law that would sustain such an order preventing property owners from removing such a foreign deposit and restoring the surface of their lands to their natural grades."

The judgment is reversed.

CARTER, J., Dissenting.—I dissent.

By adopting the opinion of the District Court of Appeal in this case, a majority of this court has held, that waters which constitute the natural and normal flow of a stream, when artificially diverted from said stream, and conveyed a distance

of over a mile away from said stream by means of an artificial watercourse, then become flood waters, and that an owner of land affected thereby has the right to discharge such waters upon the land of his neighbor with such destructive force as to cause irreparable damage to the latter, and that a person so damaged has no recourse either by injunction or an action for damages.

I cannot subscribe to such a doctrine. It is obviously unsound. It is unsupported by any decided cases either in this or other jurisdictions. It is predicated upon a misconception of the doctrine of *damnum absque injuria* as applied to the facts found by the trial court in this case.

The majority opinion correctly states that this appeal is before us on the judgment roll alone. Therefore, we must look to the pleadings and the findings of the trial court exclusively for the determination of the issues involved.

The trial court found in substance that West Cucamonga Creek is a natural stream or watercourse rising at the base of the mountains north of the city of Upland in San Bernardino County and flows in a general southwesterly direction; that at a point about six miles south of the city of Upland on the property of John G. Clock during the year 1926 by artificial means the waters naturally flowing in said stream were diverted therefrom in a southerly direction into an artificial watercourse constructed on a strip of land twenty feet wide known as ''Comet Avenue''; that this watercourse was extended from time to time a distance of about one mile in a southerly direction to the property of defendants or to what is known as Schaefer Avenue at the north boundary of defendants' property, and there said waters were permitted to spread out over defendants' land and were not confined in any channel or watercourse; that this condition existed until the rainy season of the years 1936–1937; that thereafter the defendants dug a ditch upon and in said Comet Avenue where the same extended through defendants' property and extended said ditch or channel to the property of plaintiffs. Defendants also placed a fence along the west boundary line of Comet Avenue extending from the north boundary to the south boundary of defendants' property which fence was for the purpose of and did tend to obstruct the flow of the waters from said Comet Avenue upon the lands of defendants and to confine the same within said Comet Avenue and the artifi-

cial ditch or channel constructed therein; that as a result of the construction and extension of said artificial channel by defendants, the said waters, sand and debris were confined therein and cast in large quantities upon the land of plaintiffs immediately to the south thereof; that the construction and maintenance of said artificial channel or ditch by the defendants and the precipitation of said waters, sand and debris therefrom upon the land of plaintiffs, did damage to plaintiffs' said land; that such waters, sand and debris had never theretofore flowed upon the lands of plaintiffs, except such portion of the water as might flow southwesterly upon the surface of the ground over the southwest portion of plaintiffs' property.

The court expressly found that all of the water discharging on and over defendants' land was surface water, and that none of the waters which flowed on or over defendants' land were flood waters.

The court also expressly found that the ditch or channel extending from West Cucamonga Creek on the John G. Clock property to defendants' property was not a natural watercourse.

The court also found that all of the water flowing in West Cucamonga Creek to the point where it was diverted on the John G. Clock property, was confined within the channel of said creek and that after the diversion of said waters into the ditch or canal constructed on Comet Avenue, the same were confined therein.

There is no finding that there was any excessive or extraordinary flow of water in said creek or that the water flowing therein was anything other than the natural and normal flow which usually and customarily flowed therein.

Before proceeding further, I will quote the exact language of the findings of the trial court:

"That said channel formerly carrying the waters of said West Cucamonga Creek, now exists upon the surface of the land as it has existed from time immemorial, . . . "

"That at the point where said channel intersects Comet Avenue upon the property of John G. Clock as aforesaid, the said stream originally flowed in a southwesterly direction. That since the year 1926, Comet Avenue, from said point of intersection southerly, has been cleared out and artificial dikes have been constructed from time to time along the sides

thereof by the adjacent property owners southerly to the defendants' property, and that by the year 1935, all the waters flowing in said channel have flowed directly south along Comet Avenue to the north boundary of the defendants' property which adjoins Schaefer Avenue on the south thereof.''

It is clear from the foregoing findings that had said waters not been diverted from West Cucamonga Creek by artificial means into Comet Avenue, said waters would have continued to flow on down the channel of West Cucamonga Creek in a southwesterly direction and none of said waters would ever have reached the property of either defendants or plaintiffs.

The court further found:

''All of the waters so flowing in said channel, flow in a well-defined body from a point where they enter the said channel at or near the city of Upland, California, to the defendants' property, and that none of the said waters once having reached said channel escape therefrom from the time that they enter therein until they reach the intersection of Comet Avenue and the north line of defendants' property. All of said waters, except such as are lost by percolation in the stream-bed, flow in a continuous stream through said channel as aforesaid to the north line of defendants' said property, where said channel ceases to exist, and such quantities of water as has flowed out of the end of said channel, has continued down Comet Avenue on the surface of the ground for a short distance south of Schaefer Avenue and then spread out and flow southwesterly across defendants' said property, on the surface of the ground, following the natural slope of his said land.''

Thus, it appears from the findings of the trial court that the waters in question at no point or place overflowed the banks of West Cucamonga Creek or the banks of the artificial channel constructed in Comet Avenue, but when said waters reached the end of said artificial channel, they simply spread out and flowed over the surface of the land in a southwesterly direction in accordance with the natural slope thereof.

In view of the foregoing findings, there is no basis whatever for the conclusion reached by the majority of this court in the opinion approved by it, that the waters which defendants caused to discharge and flow upon plaintiffs' property with destructive force constituted flood waters to which the rule applicable to waters which are a ''common enemy'' can

be invoked by defendants in order to relieve themselves of liability to plaintiffs for the damage caused to the latter's land as the result of the acts of said defendants in causing the discharge of such waters upon plaintiffs' land with such destructive force that it resulted in the damage thereto found by the trial court to have been caused thereby.

Notwithstanding the finding of the above and foregoing facts by the trial court, the opinion adopted by the majority of this court is based upon the erroneous assumption that the waters overflowed or escaped from the natural creek bed or channel upon the property of John G. Clock, and thus became flood waters; that thereafter, each property owner to the south constructed an artificial channel on Comet Avenue to control such flood waters and to protect his or her property from such flood waters until the channel arrived at the north boundary of defendants' property; that such waters, upon arriving at the north boundary of defendants' property, continued to be flood waters, and for that reason, defendant had the legal right to extend said artificial channel upon and along Comet Avenue and cast such waters upon the land of plaintiffs. It is obvious that the conclusion reached in said opinion is based upon the erroneous assumption that the waters of West Cucamonga Creek which constituted the natural and normal flow of said creek overflowed the natural banks of said creek upon arriving at the property of John G. Clock and thereafter became flood waters. As stated above, this assumption is directly contrary to the express findings of the trial court to the effect that the waters of said creek were diverted therefrom on to the property of said John G. Clock by artificial means into an artificial channel constructed on and along Comet Avenue, which channel was from time to time extended in a southerly direction to the lands of defendants and by defendants extended to the lands of plaintiffs.

The opinion adopted by the majority of this court concludes with the erroneous assumption that because the waters in question were once confined within the channel of West Cucamonga Creek they could not be classified as surface waters thereafter and that since these waters were the result of a storm and escaped from the natural channel of West Cucamonga Creek, they could not be classified as stream waters, and must therefore be classified as flood waters. This conclusion is clearly erroneous, because it fails to take into consideration the

facts found by the court that these waters were diverted by artificial means from West Cucamonga Creek on the John G. Clock property and conveyed in an artificial and man-constructed channel to defendants' property where the same were permitted to spread out over defendants' land until they saw fit to extend the artificial channel on Comet Avenue through their property to plaintiffs' land.

While the factual situation as disclosed by the findings of the trial court may not be such as to support the conclusion reached by the trial court that the waters flowing in the artificial channel on Comet Avenue became surface waters when the same spread out over defendants' land, such factual situation clearly does not support the conclusion reached in the opinion of the majority of this court that such waters thereby became flood waters or enemy waters which the defendants were entitled to use any means available to divert away from their land notwithstanding such diversion might result in damage to the lands of defendants' neighbors onto which such waters were discharged with such destructive force that such lands were damaged thereby.

It is obvious that so long as the waters in question were confined in the natural channel of West Cucamonga Creek, they constituted stream waters regardless of the source from which they emanated. After their diversion into the artificial channel constructed in Comet Avenue, they remained stream waters but the rules of law applicable to waters flowing in a natural stream or watercourse cease to be applicable to such waters after the same were diverted by artificial means from said stream.

If the citation of authority were necessary to support the position of the plaintiffs in this action, the case of *Thomson* v. *La Fetra,* 180 Cal. 771 [183 Pac. 152], furnishes ample authority for the conclusion reached by the trial court that plaintiffs are entitled to injunctive relief to protect their property against the continued discharge of such waters thereon. The factual situation in that case is quite similar to that in the case at bar.

In that case this court held that waters flowing in a natural watercourse which are diverted and discharged by artificial means onto adjacent land could not be classified as flood waters and that the rule applicable to waters which are a ''common

enemy'' could not be invoked under the factual situation there found to exist. In that case this court said:

''That rule has application only to flood waters in the strict sense, that is to say, to waters escaping because of their height from the confinement of a stream and running over the adjacent country. The waters here involved are not of that sort.

''The water not being in any sense flood water, the defendants, by changing its course and casting it upon the lands of the plaintiff, were guilty of a trespass. The fact that the water may have threatened injury to the defendants affords no justification or excuse to palliate the wrong done. If the injury threatened to the defendants' lands was the result of wrongful artificial changes made by upper proprietors, resulting in an increased, accelerated, or concentrated flow of water upon and across the lands of the defendants, their remedy was to proceed by appropriate action against the wrongdoers to enjoin such changes or to have the nuisance abated, and not by an attempt to shift the burden of the wrong upon an innocent third party who but for their intervening willful act would have suffered no injury at all. (*Larrabee* v. *Cloverdale,* 131 Cal. 96 [63 Pac. 143]; *Castle* v. *Reeburgh* [75 Okl. 22] 181 Pac. 297.)

''The damage suffered by the plaintiff not having resulted from a lawful act, it cannot be considered *damnum absque injuria.* The view which we have taken of the case makes it unnecessary for us to discuss and decide the plaintiff's contention that the upper proprietors had acquired a prescriptive right to have the water in question carried off over the defendants' lands.''

In view of the inevitable conclusion that the waters which defendants caused to be discharged upon plaintiffs' lands were not flood waters and that the rule applicable to waters which are a ''common enemy'' cannot be invoked by defendants under the facts found by the trial court, I am of the opinion that the judgment of the trial court should be affirmed.