[L. A. No. 16618.   In Bank.—July 31, 1941.]

CLARENCE A. EVERETT, Respondent, v. JOHN A. DAVIS et al., Appellants.

Chas. F. Blackstock for Appellants.

Durley & Downes and Henry C. Downes for Respondent.

EDMONDS, J.—The appellants were enjoined from erecting or maintaining certain fences and embankments, upon a determination that by their use surface waters had been diverted to the damage of the adjoining landowner. In challenging the correctness of this decree, they assert, contrary to the court's findings, that these were flood waters, a common enemy against which they had a right to protect their property.

The land of the respondent, upon which there is a valuable orchard, lies on each side of a public road. On the northerly side of this road, and adjoining it on the east, is the property of the appellant Davis. To the east of the Davis land is that owned by Mary Estes, who is not a party to the action. South of the road and opposite the land of Davis is the property of the appellant Hitch. North of the road, the Southern Pacific Company maintains railroad tracks which run somewhat parallel with it across the lands of Estes, Davis and

Everett. Beyond the railroad to the north, the country is hilly and rolling. It drains into a ravine or canyon known as "Estes Wash", which, the parties concede, is a natural watercourse having no flow except in times of rain.

According to the trial court's findings, prior to the construction of the railroad, which was built in 1902, the mouth of this watercourse was more than 100 feet northerly of the present location of the tracks, at which point the waters did not run in any defined channel or watercourse and spread out over the lower lands. When the railroad was constructed, a bridge was built in Estes Wash at a point about 300 feet west of the easterly boundary of the land belonging to Davis. Since that time, and until the construction of the fences complained of, the waters flowing down Estes Wash have been controlled so that they passed under this bridge and then spread over the land of Davis without flowing in any channel or watercourse. In so spreading, these waters deposited gravel and sand forming a debris cone practically uniform in its slope having its apex at the bridge and extending to the road, a distance of about 1,000 feet. The deposit of gravel and sand was built up to such an extent that its depth, at a point 200 feet south of the railroad bridge, was more than seven feet.

In 1916, a ditch was constructed on the northerly side of and parallel with the road; thereafter and until the appellants built the fences which caused the damage to the Everett orchard, the waters coming from Estes Wash flowed over the Davis land to the ditch and were carried off by it in a westerly direction. During the year 1932, Southern Pacific Company, without any objection from Davis, constructed a woven wire fence commencing at its bridge and extending to the south for about 250 feet. The purpose of this fence was to protect the railroad tracks by changing the natural flow of the waters, which is to the southeast, and sending them in a southwesterly direction. But the court found that the railroad's acts in this regard had not caused any damage to the respondent's land, and will not cause any such damage in the future.

However, according to the court's findings, the effect of the fences built by the appellants Davis and Hitch was quite different. They erected two fences, about 15 feet apart, extending from the end of the railroad company's fence to the

road. There was no natural watercourse at this point, the court determined, and after the fences were built, the waters flowing under the bridge were confined to the narrow channel between them and carried sand, gravel and silt to the ditch along the road in such quantity that it filled and overflowed. The waters then ran across the road and over the respondent's land, causing considerable damage. The court also found that the maintenance of these fences will cause the Everett orchard to become covered with worthless materials and will injure or destroy the land's productivity.

The trial court's finding that there was no natural watercourse across the Davis land is not sustained by the evidence, say the appellants. The court also erred, they assert, in its determination that the Everett orchard was damaged by the wrongful diversion of surface waters. According to their theory, these were flood waters and Davis had the right to take them across his land by the most direct route and put them into a ditch north of Los Angeles Avenue, which was a natural watercourse draining his land. The respondent takes the position that the waters, after passing through the railroad culvert did not flow in any defined channel or watercourse and that the finding of the trial court in this respect is supported by the evidence; that the waters flowing under the culvert are surface waters; and that the appellants did not have the right to gather and discharge them through a narrow channel into the highway ditch.

The finding that there is no natural watercourse upon the Davis land is supported by the testimony of a number of witnesses. Before the construction of the fences built by Davis and Hitch, these witnesses said, the waters passing under the tracks spread out in a fan-like shape over the land of Davis and were not confined in any channel. Other witnesses called by the appellant stated that they had observed conditions from which a contrary conclusion might be drawn, but their testimony only created a conflict in the evidence which the court resolved in favor of the respondent.

The nature of the waters flowing in Estes Wash presents a more difficult question. The parties concede that if these are flood waters, the appellants had a right to prevent them from coming upon their land, even if the fences built by them caused them to flow over the property of the respondent. (*Horton* v. *Goodenough*, 184 Cal. 451 [194 Pac. 34].) The rights of the parties therefore turn upon the legal classifica-

tion of waters which, after having been confined in a natural watercourse, disperse and sink into the ground by reason of the formation of an alluvial cone.

Surface waters are those falling upon, arising from, and naturally spreading over lands produced by rainfall, melting snow, or springs. They continue to be surface waters until, in obedience to the laws of gravity, they percolate through the ground or flow vagrantly over the surface of the land into well defined watercourses or streams. (*LeBrun* v. *Richards,* 210 Cal. 308 [291 Pac. 825, 72 A. L. R. 336]; *San Gabriel V. C. Club* v. *Los Angeles County,* 182 Cal. 392 [188 Pac. 554, 9 A. L. R. 1200]; *Gray* v. *Reclamation Dist. No. 1500,* 174 Cal. 622 [163 Pac. 1024]; *Mogle* v. *Moore,* 16 Cal. (2d) 1 [104 Pac. (2d) 785].) After they have been gathered into a natural channel, however, they become stream waters. (*Horton* v. *Goodenough, supra; San Gabriel V. C. Club* v. *Los Angeles County, supra; Mogle* v. *Moore, supra.*)

"Flood waters are those which escape from a stream or other body of water and overflow the adjacent territory." (*LeBrun* v. *Richards, supra.*) Such waters are said to be a common enemy, against which one may protect his land even to the detriment of his neighbor. But the drastic rule which allows a property owner to divert such waters to the lands of others only applies to flood waters in the strict sense, that is, waters escaping because of their height from the confinement of a stream and running over adjacent property. Implicit in the definition of flood waters is the element of abnormality; they are flood waters because of their escape from the usual channels under conditions which do not ordinarily occur.

The waters which flowed out of Estes Wash at the time the appellants constructed the devices to control them were not surface waters, because such waters do not include those which have once become a part of a stream. (*Horton* v. *Goodenough, supra.*) Neither were they flood waters, as the element of abnormality of escape from a stream was not present. They were the waters of a typical seasonal stream which, after having built an alluvial cone, spread over a large area and, in some measure, eventually reached the highway ditch. The fences built by the appellants interrupted the natural habits of this stream whose waters, confined to

a narrow channel, flowed with such increased acceleration that they reached the ditch at the road in full volume.

Under these circumstances, the situation of the parties is substantially the same as that shown in the case of *Thomson* v. *La Fetra*, 180 Cal. 771 [183 Pac. 152], where a flume was built to carry off the water which originally flowed out of a canyon and became diffused in the native vegetation a few hundred feet away. It was held that the rule concerning flood waters applies only "to waters escaping because of their height from the confinement of a stream and running over the adjacent country," and one who changed the course of the waters brought through the flume and cast them upon the land of another was guilty of a trespass. Applying the same principle, the appellants were properly enjoined from maintaining the fences which concentrated and accelerated the waters flowing in Estes Wash so that they reached the respondent's land instead of either sinking into the earth or being carried away by the ditch, as they had done before.

In *Mogle* v. *Moore, supra,* this court adopted an opinion written in the District Court of Appeal, which defined surface waters, stream waters and flood waters in the same terms which have been used for many years. The rights of landowners in regard to each of such waters was also stated in connection with the controversy which was then before the court. That case arose when the defendants protected their property from waters which came from West Cucamonga Creek, and it was held that these were flood waters which a landowner might obstruct.

This conclusion was based upon findings of fact, the correctness of which was not challenged. It appears that, in 1916, the waters flowing out of Cucamonga Canyon were diverted and spread over the land at the foot of the mountains. Since that time, West Cucamonga Creek has carried not only surface waters, which reach it by natural flow, but also some of the stream from Cucamonga Canyon which comes to it "infrequently in times of storm and when the waters break over or out of the check dams in said spreading ground, or at such infrequent times as the waters are turned into . . . [it] through flood gates." So far as the findings disclose, some of the waters which the defendants obstructed were therefore flood waters within the accepted definition of that term, and the court's decision must be considered as based upon this fact. However, in pointing out that waters which

overflow a channel do not become surface waters when they escape over the stream banks, the qualification ''or at the end of the channel'' was incorrectly added. As flood waters are those which break away from a stream under conditions which do not usually occur, they can never be the flow of a stream at the end of its channel.

The appellants also seek to justify their actions upon the ground that the highway ditch was the natural means of drainage; that all of the water from Estes Wash flows into it at one point or another, and therefore they were entitled to concentrate these waters by a channel and bring them to the ditch at one point. Of course, one may gather and discharge surface waters into a stream which is their natural means of drainage. (*San Gabriel V. C.* v. *Los Angeles, supra.*) But before the acts complained of in the present case, the water naturally dispersed over the land, and that part of it which reached the ditch had lost much of its force. After the appellants constructed their fences, the waters were sent through a narrow channel in a manner quite different from the natural flow. Theretofore only some of these waters had flowed into the ditch at different points over a wide area; the channel contrived by the appellants brought practically all of the flow of Estes Wash to one point with destructive force. Under these circumstances the principle relied upon by the appellants has no application.

The judgment is affirmed.

Gibson, C. J., Shenk, J., Curtis, J., and Pullen, J., *pro tem.,* concurred.

CARTER, J., Concurring.—I concur in the judgment of affirmance, but I do not agree with the analysis of the case of *Mogle* v. *Moore,* 16 Cal. (2d) 1 [104 Pac. (2d) 785], contained in the majority opinion and I am not in accord with the views expressed in said opinion with respect to the character of the waters which are the subject of this action.

The majority opinion states that the waters involved in the case of *Mogle* v. *Moore* were flood waters because the trial court found that some of the waters which constituted the flow in West Cucamonga Creek came from check dams which infrequently overflowed, which dams were situated a distance of approximately six miles from where these waters were

diverted from West Cucamonga Creek and conveyed to plaintiff's property. In the Mogle case the trial court found that West Cucamonga Creek was a natural stream or watercourse with a well defined channel, and "that all the waters so flowing in said channel, flow in a well defined body from a point where they enter said channel at or near the City of Upland, California, to the defendant's property, and that none of said waters once they have reached said channel escape therefrom from the time that they enter therein until they reach the intersection of Comet Avenue and the north line of defendant's property." The court also found that the waters of West Cucamonga Creek were diverted from said creek by artificial means and into an artificial channel and conveyed thereby a distance of approximately one mile to defendant's property and then discharged onto plaintiff's property by artificial means provided by defendant.

Notwithstanding these findings by the trial court in the Mogle case, this court held that the waters so diverted and discharged by defendant onto plaintiff's property, constituted flood or enemy waters which defendant was entitled to divert away from his property and that any injury suffered by plaintiff as the result of such diversion was *damnum absque injuria.*

I disagreed with the majority opinion in the Mogle case and set forth my views at length in a dissenting opinion at the time said case was decided by this court.

The majority opinion in the case at bar now concedes that the statement of this court in the majority opinion in the Mogle case that waters escaping "at the end of the channel," was incorrectly added. This statement in the majority opinion does not cure the erroneous pronouncements in the majority opinion in the Mogle case. It simply leaves the Mogle case standing as authority for the proposition that waters which constitute the natural and normal flow of a stream, when artificially diverted from said stream, and conveyed a distance of over a mile away from said stream by means of an artificial watercourse, then become flood waters, and that an owner of land affected thereby has the right to discharge such waters upon the land of his neighbor with such destructive force as to cause irreparable damage to the latter, and that a person so damaged has no recourse either by injunction or action for damages.

The Mogle case was a much weaker case than the case at bar so far as the rights of the respective defendants are concerned, but this court reversed the judgment of the trial court in that case granting an injunction and awarding damages to the plaintiff, and is affirming the judgment in the case at bar which awards similar relief to the plaintiff. The two conclusions are absolutely inconsistent, and there is no logical basis upon which they can be reconciled.

There can be no question but that the majority opinion of the District Court of Appeal in the case at bar (*Everett* v. *Davis*, (Cal. App.) [107 Pac. (2d) 650]) was the result of the confusion created by the decision of this court in the Mogle case, and in my opinion the majority opinion in the case at bar simply adds to that confusion.

It appears from the record in the case at bar that the waters which are the subject of this action, during certain periods of each year flow for a number of miles within a well defined watercourse down what is known as Estes Wash to the natural end of said watercourse located on appellant's lands, which have been adapted to the growing of ordinary field crops. There the waters spread out and mostly disappear, and such was the condition for many years. That by means of artificial structures appellants began diverting the water from the end of the watercourse over and across their land in such a manner as to cause said waters to discharge onto respondent's land, upon which there is a valuable growing orchard resulting in great damage thereto.

The legal proposition involved is whether or not appellants have the right to so divert the water flowing onto their land from Estes Wash that it discharges onto and causes damage to plaintiff's property without responding in damages to plaintiff as the result of such diversion.

Under rules of law which should be regarded as settled in this state by numerous decisions of this court, the defendants did not have the right to discharge such waters onto plaintiff's land to the latter's damage unless it can be said that said waters were flood or enemy waters as defined in the decisions of this court. (*Barnes* v. *Marshall,* 68 Cal. 569 [10 Pac. 115] ; *Lamb* v. *Reclamation District No. 108,* 73 Cal. 125, 126 [14 Pac. 625, 2 Am. St. Rep. 775] ; *De Baker* v. *Southern California Railway Co.,* 106 Cal. 257 [39 Pac. 610, 46 Am. St. Rep. 237] ; *Sanguinetti* v. *Pock,* 136 Cal. 466 [69 Pac. 98, 89 Am. St. Rep.

169] ; *Horton* v. *Goodenough,* 184 Cal. 451 [194 Pac. 34] ; *Thomson* v. *La Fetra,* 180 Cal. 771 [183 Pac. 152].)

I think it is clear from the facts appearing in the record in this case that the waters discharging from Estes Wash onto defendants' property which they diverted and caused to discharge onto plaintiff's property with such destructive force that plaintiff was caused to suffer damage thereby, were not flood waters as defined in the above mentioned authorities. Obviously, they were stream waters until they defused out over the flat lands and ceased to be confined in a channel. In my opinion these waters did not then become surface waters as such waters are defined in the decisions of this court. (*Heier* v. *Krull,* 160 Cal. 441 [117 Pac. 530].)

Regardless of what definition may be given to waters of the character here involved, in my opinion the law should be that where a natural stream ends and the natural flow therefrom spreads out over land without a definite channel, whether we call such waters after leaving the stream, surface waters or stream waters, the owner of such lands should not be permitted to accumulate or concentrate the same into a ditch or channel and discharge the same upon his neighbor's property with such destructive force that damage results therefrom without responding in damages and being restrained from the commission of such acts which will cause further damage to his neighbor's land. My conclusion on this proposition is based upon the maxim that one should not be permitted to so use his own property as to cause damage to another. This rule should be applicable to a situation where the person causing the damage acquired his property in the light of the physical situation existing at the time of its acquisition, and if his property was then subjected to the burden of the run-off of a natural stream such as Estes Wash, he should not be permitted to change the natural conditions to the damage of his neighbor's property, as the latter is entitled to the maintenance of the natural conditions which existed at the time he acquired his property, or at the time the respective properties were developed and devoted to beneficial uses.

For the foregoing reasons the judgment of the trial court in my opinion should be affirmed.